THE AUDITORIUM, INC., a Delaware corporation, Petitioner Below, Appellant, v. THE BOARD OF ADJUSTMENT OF THE MAYOR AND COUNCIL OF WILMINGTON, a municipal corporation of the State of Delaware, Defendant Below, Appellee.

374

(*October* 10, 1952.)

WOLCOTT and TUNNELL, Justices, and HERRMANN, J., sitting.

*David F. Anderson* (of Berl, Potter and Anderson) for appellant.

*Herbert B. Warburton*, Assistant City Solicitor, for appellee.

Supreme Court of the State of Delaware, No. 12, A. D. 1952.

WOLCOTT, J.:

This appeal seeks review of the application of the Building Zone Ordinance of Wilmington by the municipal authorities to the appellant's property. Two basic questions are raised, viz., first, is the appellant's property located within a Business "B" Zoning District of Wilmington, and, second, in the event the first question is answered in the negative, may the appellant's building be used for the showing of athletic exhibitions?

The appellant is the owner of the premises known as the Auditorium, located at 704 West 11th Street in Wilmington. The Auditorium is a large one-story building with a main entrance on 11th Street and having two small stores on either side of the main entrance. The balance of the building consists of a large room designed for use as a place of public assembly. The premises are located on the southerly side of 11th Street and are about in the middle of the block formed by Madison Street on the east and Monroe Street on the west. They have a frontage on 11th Street of 70 feet and extend between parallel lines in a southerly direction to a depth of 230 feet. The easterly boundary of the premises runs, at a distance of 155 feet from the west-

erly side of Madison Street, along the westerly side of an alley running parallel to Madison Street through the block from 11th Street to 10th Street. The easterly side of the alley is the rear boundary of the properties fronting on the westerly side of Madison Street between 10th and 11th Streets.

The Auditorium was erected some time prior to 1900 and, thereafter, until 1941, it was regularly used as a place of public assembly for sporting events, dances, automobile shows, roller skating and other similar events.

On July 24, 1924, pursuant to the enabling act of the General Assembly, 1935 *Code*, Ch. 179 §§ 6228-6236, Wilmington enacted a Building Zone Ordinance. By Section 1 of this ordinance the city was divided into zone districts. The boundaries of the zone district were declared to be "established as shown on the Building Zone Map" which accompanied and was declared to be a part of the ordinance.

At the trial of the cause before the Superior Court, a Building Zone Map was exhibited to the court by the Building Inspector of Wilmington. He testified that the map thus shown was kept by him in his office and was used to establish zone boundaries whenever it was necessary to do so in the performance of the duties of his office. The map thus exhibited bore an inscription "Building Zone Map of Wilmington, Delaware, January, 1924". The Building Inspector testified that as far as he knew, that map was the original zoning map referred to in the Building Zone Ordinance of 1924.

The Clerk of City Council in whose custody all official papers of the city are held was unable to produce at the trial in the Superior Court the original Building Zone Ordinance enacted in 1924. He testified that in his opinion the map kept in the office of the Building Inspector was the official Building Zone Map of Wilmington.

At the argument of the appeal before this court, by stipulation of counsel, the original Building Zone Ordinance, which

had been subsequently located, was submitted for our examination. Attached to this original ordinance was the official Building Zone Map of 1924. The map thus attached is smaller than the map retained in the office of the Building Inspector. We have not seen the Building Inspector's map, since it was not physically put in evidence in the cause below, but counsel stated that it showed on a somewhat larger scale the same data with respect to the block we are concerned with as is shown on the official Building Zone Map attached to the original ordinance of 1924. While the record is unsatisfactory in this respect, by force of necessity and stipulation of counsel we must assume that the zone boundaries for the city are those shown on the map submitted for our inspection.

It appears from an inspection of the Building Zone Map of 1924 that the block bounded by Madison, Monroe, 11th and 10th Streets, contains three building zone districts. The block is divided by a line running north and south between 11th and 10th Streets dividing the block approximately in half. That portion of the block lying to the west of the north-south division line is designated on the map as a Residence "C" District. That portion of the block lying to the east of the north-south line is divided approximately in half by an east-west line running between a point on the westerly side of Madison Street and a point on the north-south dividing line. The northerly portion of the easterly part of the block is designated as a Business "B" District. The southerly portion of the easterly part of the block is designated as an Apartment District.

Neither the property lines nor the alley referred to above are shown on the Building Zone Map. There is nothing in the record before us to indicate the number and types of properties contained within the block, nor to show the property lines of the various properties. The record contains no showing of any distances contained within the block except the dimensions of the appellant's property and its distance from the corner of Madison and 11th Streets. Nor does the record disclose the length of the sides of the block along the four streets enclosing it.

There is testimony that the property located at the corner of 11th and Madison Streets is a business property and that this corner property is the only business property contained within the block, and that the Business "B" District shown on the Building Zone Map is considered by the city authorities to be confined to the lot boundaries of that corner property. It appears, however, that the corner property does not extend to the south down Madison Street to a point anywhere near the middle of that block.

As we have stated before, the Auditorium was in existence at the time of the first enactment of the Building Zone Ordinance of Wilmington. At that time, it was used for public sporting exhibitions and other uses which required public gatherings. This use was continued by the owners of the building until August 28, 1940 when an order of the Board of Adjustment was entered granting permission to use the Auditorium for furniture exhibitions as an improvement to the neighborhood. This order recited that the Auditorium was located in an Apartment District and also reserved to the appellant the right to use the Auditorium for boxing and wrestling bouts. Thereafter, commencing in the fall of 1941, the Auditorium building was used solely for furniture exhibitions until the present application was made to the Building Inspector seeking permission to make alterations to resume the showing of athletic exhibitions.

The Building Inspector refused the present application and from this refusal an appeal was taken to the Board of Adjustment which affirmed the ruling of the Building Inspector. From that affirmance the cause was taken to the Superior Court of New Castle County by writ of *certiorari*. The record of the proceedings before the Board of Adjustment consisting of a notice of application, an objection signed by 122 residents of the neighborhood, an objection signed by four doctors who objected to the proposed use on the ground that it would be a disturbing influence to the patients of the Osteopathic Hospital located at 1105 Madison Street, and the ruling of the Board of Adjustment was sent to the Superior Court.

We again observed in *Searles v. Darling, Del.* 83 *A.* 2d 96, 98, that the Board of Adjustment has failed to comply with 1935 *Code*, § 6234, requiring that the return of the Board of Adjustment to a writ of *certiorari* "shall concisely set forth such other facts as may be pertinent and material to show the grounds of the decision appealed from". The record submitted to the Superior Court contains a statement of the Board's conclusions but omits any statement of the facts upon which they are based. This record, therefore, contains no basis for review. The burden, therefore, was unfairly imposed upon the Superior Court to take testimony to ascertain the facts, since that court has no authority to remand the proceedings to the Board of Adjustment. *Searles v. Darling, supra.*

The Superior Court held a hearing at which testimony was received to supplement the deficiences in the record forwarded by the Board of Adjustment. From the testimony of the Building Inspector and of the Chief Engineer of the Street and Sewer Department, who is also a member of the Board of Adjustment, it appears that in the opinion of both of these witnesses it is impossible to determine the exact boundary lines between the zone districts in which the Auditorium may be located from the Building Zone Map because of the small scale of that map. Both witnesses testified that certain zone boundary lines were determined by the application of an unwritten rule established by the Board of Adjustment to the effect that zone boundary lines should be established in doubtful cases by the rear property lines of properties admittedly in one district. Consequently, the Business District clearly appearing from the Building Zone Map on the northeast corner of the block we are concerned with was established as having boundary lines conforming to the boundaries of the corner property, and since the rear line of that property was the easterly boundary of the alley referred to above, the Business Zone was considered as not extending beyond that alley.

The Chief Engineer testified that, to his knowledge, the Board of Adjustment never referred to the Building Zone Map

in the custody of the Building Inspector in order to establish zone boundaries. He testified that the Building Zone Map had been replaced by a new map prepared by the Street and Sewer Department in 1936 which, since that time, had been used by the Board of Adjustment as the official map of Wilmington for zoning purposes.

With the foregoing factual statement in mind, we turn now to a consideration of the first question for decision—that is, is the appellant's property located within a Business "B" Zoning District? Obviously, this requires a determination of the westerly zone line of the Business "B" District which either embraces all or part of the appellant's property, or runs along its easterly boundary.

The right of municipalities to establish zoning regulations when permitted to do so by enabling state legislation is well settled. By 1935 *Code*, § 6231, the legislative body of any municipality in Delaware is authorized to provide for the manner in which boundaries of zoning districts shall be established and amended. This law requires that no zone boundary shall become effective until after public hearing upon 15 days' notice. The right to establish zone districts and fix their boundaries is a legislative one. Since the power is legislative and since it has been delegated by the Legislature to the legislative body of municipalities, only the legislative body of the municipality may establish the boundaries of the zone districts. This as a general proposition is uniformly the law. 8 *McQuillin, Municipal Corporations* (3rd Ed.) Sec. 25.77; *Berman v. Exley*, 355 *Pa.* 415, 50 *A.* 2d 199; *Bray v. Beyer*, 292 *Ky.* 162, 166 *S. W.* 2d 290.

The City Council of Wilmington, the legislative body of that municipality, purported to comply with this requirement of law by Section 1 of the Building Zone Ordinance as amended. In that section the following establishment of zone district boundaries is made:

"The boundaries of these districts are hereby established as shown on the Building Zone Map which accomp-

anies and is hereby declared to be a part of this Ordinance. When a district boundary line is within ten feet of any lot boundary line, and the acute angle formed between the two lines is less than 30 degrees, the district boundary line shall be deemed to coincide with such lot boundary line."

All zoning ordinances establishing zone district boundaries are required to do so within reasonable certainty so that the zone districts will have definite boundaries reasonably capable of being ascertained by the public and the administrative bodies charged with the enforcement of the ordinance. The establishment of zone district boundaries may not be left to the uncertainty of proof by extrinsic evidence. The boundaries must be definitely established by the ordinance itself. The establishment of zones is ineffective when the fixing of the boundaries of the zones is left to the ungoverned discretion, caprice or arbitrary action of municipal administrative bodies or officials. 8 *McQuillin, Municipal Corporations* (3rd Ed.) Secs. 25.59, 25.62; *Moon v. Smith,* 138 *Fla.* 410, 189 *So.* 835; *Speroni v. Board of Appeals of Sterling,* 368 *Ill.* 568, 15 *N. E.* 2d 302; *Wasen v. City of Fargo,* 49 *N. D.* 168, 190 *N. W.* 546, 25 *A. L. R.* 758; *Dowsey v. Village of Kensington,* 257 *N. Y.* 221, 177 *N. E.* 427, 86 *A. L. R.* 642; *Selectmen of Sudbury v. Garden City Gravel Corp.,* 300 *Mass.* 41, 14 N. E. 2d 112. The establishment of zone boundaries by reference to a map specifically incorporated as a part of the zoning ordinance complies with the requirement of reasonable certainty and definiteness of zone boundaries. *Eckert v. Jacobs, Tex. Civ. App.,* 142 S. W. 2d 374.

In this cause, however, both the Building Inspector and Chief Engineer of the Street and Sewer Department stated as their opinion that it was impossible to ascertain from the Building Zone Map with any certainty the location of the zone boundaries involved in this appeal. The means of location of boundaries, therefore, adopted by the administrative officials of the municipality was to ascertain from a map in a general way the zone or zones in which a particular property might possibly be located, and then by the application of the unwritten rule of

the Board of Adjustment, to establish by that means and independent of any reference to the division line as it appeared on the Building Zone Map, the actual boundaries of the zones in question.

However, the Building Zone Map submitted to us for our examination, while small in scale, clearly indicates a sharp dividing line between the three zone districts located within the confines of the block we are concerned with. It is therefore, difficult for us to accept a conclusion that it would be impossible by enlargement process in scale to reproduce the map of the block in question in a size sufficient to permit of precise measurement of the beginning and ending points of the zone boundary lines appearing on the Building Zone Map. It would also seem to us a relatively simple matter to superimpose the building lines upon the enlarged map in order to ascertain the location of the zone boundaries with respect to the appellant's property. The record is silent with respect to any attempt on the part of the city authorities to ascertain the location of the zone boundary lines by any such method.

We think it clear that a requirement of law is that the zone district boundaries be established by the Building Zone Ordinance itself, and not by the application of a rule, written or unwritten, formulated by an administrative body of the City of Wilmington. The authorities to which we have referred above prohibit approval of any such scheme for the fixing of zone boundary lines. We accordingly reject the argument made upon this point by the City Solicitor to the effect that the Building Zone Ordinance establishes basic general areas for zoning and delegates to the Board of Adjustment authority under the enabling legislation to specifically locate the zone boundaries. We think it clear that the establishment of zone boundaries is a legislative function not delegable to an administrative body. Furthermore, the fixing of zone boundaries by the method apparently in use by the Board of Adjustment is in direct contravention of the requirement of 1935 *Code*, § 6231 that zone boundaries may be fixed or amended only after public hearing

upon at least 15 days' notice. Accordingly, we are of the opinion that if it is impossible by enlargement process or otherwise to measure the distances on the Building Zone Map so as to permit the establishment of zone district boundaries from that map, then the result with respect to the appellant's property is that it is unzoned. The Superior Court was of the opinion that the zone boundaries involved in this litigation were sufficiently established through the application of the unwritten rule of the Board of Adjustment, even though they could not be established from the Building Zone Map. But, as we have pointed out, the fixing of zone boundaries must be made by the ordinance and may not be delegated to an administrative body. Accordingly, we think that this cause must be remanded to the Superior Court with instructions to ascertain the zone boundaries concerned from the Building Zone Map, and to determine in what zone the appellant's property is located and give judgment accordingly. In the event further trial should demonstrate the correctness of the testimony of the Building Inspector and the Chief Engineer of the Street and Sewer Department that this task is impossible of performance, then judgment should be entered overruling the decision of the Board of Adjustment.

We point out that we have expressed no opinion as to what the result will be in the event it should be established that the zone boundary runs through the appellant's building. We have not done so because the question has not been argued before us. Nor, do we think, that the record before us would have permitted the question to be argued.

The appellant further argues that because the use to which it now desires to put the building—that is, the holding of sporting exhibitions—was the use to which the building was put at the time of adoption of the zoning ordinance in 1924, that it may not now be precluded from continuing that use, assuming it to be a non-conforming use. This argument has pertinency only in the event the appellant's premises are found to be located in a Residence or Apartment District and not in a Business District as the appellant contends.

The basis of this argument made by appellant is found in Section 2 of the Building Zone Ordinance which provides that an existing use of any building at the time of enactment of the Building Zone Ordinance would not be required to be made conforming. By reason of this provision, the appellant argues that it is merely seeking to continue a non-conforming use in existence at the time of enactment of the ordinance. It argues that the change in 1941 in the use to which the building was put from that of an arena for the showing of sporting exhibitions to a furniture showroom did not constitute an abandonment by it of the existing non-conforming use. In this connection, it points to the reservation contained in the order of 1940 of the Board of Adjustment giving permission for the furniture exhibitions and at the same time reserving the future right to the appellant for the holding of sporting exhibitions.

Under the provisions of practically all Building Zone Ordinances the abandonment of an existing non-conforming use prevents its re-establishment after such abandonment. What constitutes an abandonment of a non-conforming use depends upon the circumstances of each case and the terms of the Zoning Ordinance. Generally speaking, abandonment seems to be something more than a mere temporary suspension of the use and requires the concurrence of an intention on the part of the owner to abandon or relinquish the use with an overt act, or failure to act, showing the consummation of that intention. 58 *Am. Jur. Zoning*, Sec. 153; *Landay v. MacWilliams*, 173 *Md.* 460, 196 *A.* 293, 114 *A. L. R.* 984.

The appellant urges that since it, in 1940, expressly reserved for its future use the prior non-conforming use, it indicated the intent not to abandon that non-conforming use and may now resume it. We think the appellant would probably be correct in this contention if there were no express provision in the Building Zone Ordinance governing the situation.

There is a distinction made in the reported decisions between a Building Zone Ordinance which in terms permits the

continuance of a non-conforming use until its abandonment and one which forfeits the right of the non-conforming user whenever it is discontinued. Abandonment does not result from mere discontinuance for a period of time. *Lehmaier v. Wadsworth,* 122 *Conn.* 571, 191 *A.* 539; *Campbell v. Board of Adjustment,* 118 *N. J. L.* 116, 191 *A.* 742; *Provident, etc. v. Castles,* 168 *A.* 169, 11 *N. J. Misc.* 773.

However, in the Building Zone Ordinance of Wilmington it is provided in Section 2 thereof that "any non-conforming use which shall have been abandoned exceeding two years shall not thereafter be resumed". In Zoning Ordinances the words "discontinue" and "abandon" are largely synonymous. *Landay v. MacWilliams, supra.* Consequently, the Wilmington ordinance makes specific provision as to what effect a discontinuance of a non-conforming use for a period of over two years shall have upon the right to continue that non-conforming use thereafter. We think this provision of the ordinance in effect provides that non-user of a non-conforming use in excess of two years shall conclusively be presumed to be an abandonment of that use. That being so, the provision of the ordinance prevents a resumption of the prior non-conforming use. It therefore follows that the attempt of the Board of Adjustment to reserve the right to resume the prior non-conforming use for an indefinite period in the future was contrary to the express provision of the Building Zone Ordinance and, therefore, of no effect.

The appellant finally argues in this connection that since the change in 1941 was from one non-conforming commercial use to another non-conforming commercial use, the property has been used continuously for commercial purposes and is thus entitled to the benefit of the saving provisions of Section 2 of the Building Zone Ordinance. The argument thus made is based upon the erroneous conception that Section 2 deals with non-conforming uses of a general classification. We think it clear, however, that the non-conforming uses expressly permitted to be continued by Section 2 are specific non-con-

forming uses and are not to be extended to include general use classifications.

Consequently, the result must be ·if the appellant's premises are found to be located in either a Residence or Apartment District, that it must be held to have abandoned the prior non-conforming use for the showing of sporting exhibitions.

For the foregoing reasons, the cause will be remanded to the Superior Court of New Castle County for further proceedings ·in conformity with this opinion.