THOMAS F. JENKINS vs. TOWN OF PEPPERELL.

Middlesex. March 19, 1984. — June 14, 1984.

Present: BROWN, DREBEN, & WARNER, JJ.

*Zoning,* Zone boundary.

On appeal from a judgment declaring that the portion of a town's zoning by-
law designating an "urban residence" district and a "suburban residence"
district was invalid as applied to a landowner's property because a
discrepancy in the zoning map made possible three different interpreta-
tions as to the location of the boundary between the two districts, it was
held that the by-law was valid and that the boundary should be fixed in
accordance with the interpretation most favorable to the landowner.
[269-270]

CIVIL ACTION commenced in the Land Court Department
on October 2, 1981.

The case was heard by *Randall,* J.

*Joseph P. Hannon,* Town Counsel, for the defendant.

*Richard E. Duggan* for the plaintiff.

BROWN, J. This case involves the plaintiff Jenkins' efforts
to determine the zoning that applied to land that he owned in
the town of Pepperell. Jenkins brought an action in the Land
Court pursuant to G. L. c. 240, § 14A, seeking a declaration
that the zoning was invalid as applied to his land. The Land
Court judge ruled that the zoning boundary was fatally indefi-
nite and entered judgment declaring Jenkins' property to be
unzoned. We concur with the conclusion of indefiniteness but
think that the judge erred as to the consequences which flow
from that determination.

Drawing on the judge's findings, supplemented in some
minor respects from the evidence, we summarize the facts. In
1977, Jenkins purchased three contiguous, four-acre lots[1] that

---

[1] These lots were originally laid out in a subdivision plan approved by
the Pepperell planning board in 1970. We adopt as do the parties, the
subdivision plan's designations of the lots as lots 2, 3, and 4. See appended map.

are the subject of this action. On each of the lots was a twelve-unit apartment building that was apparently built in late 1972. Before purchasing the property, Jenkins sought to determine what zoning applied. He purchased a copy of the 1974 zoning by-law — sold by the town in booklet form — which incorporated by reference an official map kept on file at the town clerk's office. A small reproduction of the official map was included in the booklet that Jenkins obtained. The map revealed that there was a boundary line in the vicinity of his property that separated an "urban residence" district on the west from a "suburban residence" district on the east. If the property was in the urban residence district, he could develop multi-family housing in addition to the existing apartment buildings. If the property was in the suburban residence district, no new development could take place.

It was difficult to ascertain from the reproduced zoning map where the boundary line in fact fell in relation to the property because of the map's small scale and because neither the lot lines nor the subdivision roads were shown. Jenkins did not at this time examine the official map,[2] nor did he consult any town official.[3] Nevertheless, after receiving an appraisal from the prospective seller and investigating the history of the development of the lots, Jenkins satisfied himself that the entire property was in the less restrictive urban residence district.[4]

---

[2] The official map also did not include the lot lines and the subdivision roads but was of a larger scale and greater detail. It further differed from the small reproduction in that it included an important annotation discussed *infra*.

[3] Section 2 of the zoning by-law provided a method of clarifying zoning boundaries as follows: "In cases of uncertainty or disagreement concerning the exact location of a district boundary line or where physical or cultural features existing on the ground are at variance with those shown on the . . . Zoning Map or in other circumstances not covered herein, the district boundary shall be determined by the Board of Appeals. . . ."

[4] The zoning that had been in effect at the time the apartments were constructed showed a similar dividing line between a more restrictive district to the east and a less restrictive district to the west. Under that earlier zoning, apartments could have been constructed in either of the two classifications, but their construction required a special permit in the more restrictive one. After Jenkins' investigation revealed that no special permits had

Serious efforts to develop the property further appear to have begun in January of 1981, when Jenkins hired an engineering and surveying firm to prepare a topographic map of the property. In February of that same year he sought a clarification from the town of what zoning applied.[5] Instead of making inquiries of the board of appeals (see note 3, *supra*), Jenkins sent a letter to the Pepperell building inspector,[6] in which he stated "since the zoning map seems to be unclear as to the zoning applicable to the property, I would like your ruling as to the proper zone for my land." Jenkins admitted in the letter that "the dividing line may seem to bisect the property" but urged that under § 2 of the by-law, the building inspector would be warranted in deciding that the entire parcel should be included in the urban residence district.[7]

The building inspector responded that, because the apartment buildings were built prior to the adoption of the current zoning by-law, "it is reasonable to assume that the district line between Urban Residence and Suburban Residence was established to include the existing apartment houses . . . ." Jenkins then proceeded to apply for building permits for the construction of multiple family housing on the lots, development that was permissible under the urban residence classification but prohibited under the suburban residence classification. In the course of the application process, Jenkins learned that the planning board disagreed that the land should be classified as in the urban residence district. Jenkins instructed his surveyor to examine the town's zoning proceedings and to plot the zoning

been granted for the apartments constructed on the lots, he decided that the property must have been in the less restrictive district. Because the 1974 zoning appeared to incorporate the same dividing line, Jenkins concluded that the property was in the less restrictive of the new zoning classifications.

[5] The 1974 by-law was amended in 1980, but the amendment is not material to the instant matter.

[6] Under the by-law, zoning enforcement duties were delegated to the building inspector. See G. L. c. 40A, § 7.

[7] In his letter, Jenkins argued that the existing apartment buildings on the lots were the type of "physical characteristic" that would support a ruling that the lots were fully within the urban residence classification notwithstanding the boundary which the line might appear to define (see note 3, *supra*).

boundary on the topographic map that had been drawn. The surveyor studied the by-law and the official map as well as a separate metes and bounds description of the district boundaries written by the planning board.[8] Based on his study, the surveyor concluded that there were two ways that the line could be drawn, both of which ran through Jenkins' property.

Meanwhile, the planning board had appealed the "ruling" of the building inspector to the board of appeals. In a decision rendered August 6, 1981, the board of appeals stated that the building inspector's letter was merely an advisory opinion and not a permit to act and that therefore the planning board's appeal was premature. For the sake of clarification, though, the board gave its own interpretation of where the line should be drawn, an interpretation which differed from the two possibilities found by Jenkins' surveyor.[9]

The different theories as to where the boundary line should be drawn apparently stem from an ambiguity in the official map. The line in controversy appears to connect two points, the intersection of Reedy Meadow Brook and the Nashua River on the north (see appended map, point A) and the intersection of Lowell Road and Leighton Street on the south (see appended map, point B). On the official map, there is an annotation to the line which states "true north from intersection," with arrows leading from the annotation to points A and B.[10] Point A, however, is not exactly true north of point B, but some 125 feet to the west of such a true north line. This discrepancy generates three possible interpretations. The first is that the

---

[8] The metes and bounds description appeared in a letter to the board of appeals dated December 16, 1980, and was not written in response to the present controversy.

[9] Jenkins appealed the decision of the board of appeals to the District Court, and that action ended in an agreement for judgment on October 23, 1981. The parties agreed that the building inspector's letter would not be construed as a permit to build or an assurance that a permit to build would issue, and that the board of appeals' decision be annulled and its remarks as to the location of the line declared a nullity. In the meantime, the instant action had been filed on October 2, 1981.

[10] This annotation does not appear on the small reproductions of the map that were included in the zoning by-law booklets.

line was intended to connect point A and point B, irrespective of the annotation.[11] The second is that the line was intended to be a northerly projection from point B, irrespective of the fact that it did not intersect point A.[12] The third is that the line was intended to be a southerly projection from point A, irrespective of the fact that it did not intersect point B.[13]

Under § 2 of Pepperell's zoning by-law, district boundaries are defined by the official zoning map. A land owner is thus bound by this map unless, carrying the burden of proof, he can demonstrate that a different boundary was intended. See *Parmenter* v. *Board of Appeals of Grafton,* 360 Mass. 852 (1971). What Jenkins was able to demonstrate at trial was not that a different boundary line was intended from what was drawn on the map,[14] but that the line that did appear on the map was susceptible to more than one reasonable interpretation. This ambiguity prevented him from determining where the boundary was intended to fall within a 125 foot wide strip.[15] At trial, the town offered no extrinsic evidence that might have resolved which interpretation was intended. See *Parmenter,*

---

[11] This was the opinion of the board of appeals in its decision dated August 6, 1981, later declared a nullity.

[12] This was one of the possibilities found by Jenkins' surveyor. On appeal, the town argues that it is the only plausible interpretation.

[13] This was the other possibility found by Jenkins' surveyor, and was based on the interpretation that the planning board gave in its metes and bounds description.

[14] The trial judge made no finding as to the plausibility of the view originally held by Jenkins and by the building inspector that the line fell to the east of the property, contrary to the indications of the zoning map. Jenkins based his initial assessment primarily on his assumptions as to the legality of the apartment use when built and as to the relationship of the 1968 and 1974 zoning by-laws (see note 4, *supra*). He made no study of the official map until much later and presented no testimony that the line illustrated on the map was not meant to be determinative. The only direct evidence on this point is the building inspector's conclusory statement in his letter that "it is reasonable to assume that the district line between Urban Residence and Suburban Residence was established to include the existing apartment houses . . . ."

[15] This strip fell mainly within lot 3, and overlapped small portions of lots 2 and 4 (see appended map).

360 Mass. at 852. Cf. *Selectmen of Sudbury* v. *Garden City Gravel Corp.,* 300 Mass. 41, 43 (1938). This being the case, Jenkins is entitled to the full benefit of the ambiguity. The trial judge went further, however, and declared all of Jenkins' property to be unaffected by the zoning by-law. This resolution granted Jenkins an unjustified windfall and was error.

A distinction should be drawn between zoning schemes that, as here, simply contain an ambiguity as to which of a small, finite number of alternatives was intended, and those that are so inherently indefinite and vague as to violate constitutional principles. See *O'Connell* v. *Brockton Bd. of Appeals,* 344 Mass. 208, 210-212 (1962). Zoning is entitled to a strong presumption of constitutional validity (*Rosko* v. *Marlborough,* 355 Mass. 51, 53 [1968]), and courts should be wary of declaring zoning fatally indefinite. Where a determination of an uncertain zoning boundary is possible, courts should endeavor to do so, notwithstanding the fact that that determination is often a troublesome one to make. See *Ciaffone* v. *Community Shopping Corp.,* 195 Va. 41, 48 (1953). The problem that faced the trial judge was that the town did not offer such extrinsic evidence as would have allowed him to choose between the three competing interpretations derived from the zoning map. The proper remedy, however, in such a situation is not invalidation of the zoning, but rather the fixing of the boundary in accordance with the interpretation most favorable to the landowner. See *H.P.V.T. Corp.* v. *McGuire,* 58 Misc.2d 159, 163 (N.Y. Sup. Ct. 1968).[16]

The judgment is vacated, and the case is remanded to the Land Court for further proceedings consistent with this opinion.

*So ordered.*

---

[16] Even had there been no ambiguity in the official map, the precise location of the zoning boundary would not have been immediately apparent because of the map's lack of detail. This fact, however, is not enough to invalidate the zoning. See *Beechwood Acres, Inc.* v. *Hamilton,* 350 Mass. 655, 658-659 (1966). See also *Maki* v. *Yarmouth,* 340 Mass. 207, 211 (1960); *Farrugia* v. *Board of Appeals of Marshfield,* 14 Mass. App. Ct. 720, 721-722 (1982); *Fogelman* v. *Chatham,* 15 Mass. App. Ct. 585, 588-591 (1983); *The Auditorium, Inc.* v. *Board of Adjustment,* 47 Del. 373, 383 (1952).