[Nos. 36345, 36496.   Department One.   June 13, 1963.]

JAMES W. PIERCE *et al., Respondents,* v. KING COUNTY, *Respondent,* EASTGATE IMPROVEMENT COMPANY, *Intervenor-Appellant.*

EASTGATE IMPROVEMENT COMPANY, *Appellant,* v. KING COUNTY, *Respondent.*

EASTGATE IMPROVEMENT COMPANY, *Appellant,* v. KING COUNTY, *Respondent,* JAMES W. PIERCE *et al., Intervenor-Respondents.**

* Reported in 382 P. (2d) 628.

*Michael P. Donovan*, for appellant.

*Hullin, Ehrlichman, Carroll & Roberts*, for respondents Pierce *et al.*

*Derrill T. Bastian*, for respondent King County.

HALE, J.—This is an appeal from judgments of the superior court in both certiorari and mandamus arising out of certain zoning resolutions in King County, Washington.

The certiorari and mandamus proceedings were consolidated for the trial and this appeal.

Appellant, Eastgate Improvement Company, was part owner of and directly connected with the development of some two thousand acres of agricultural land east of Lake Washington in King County. When appellant and other corporations having common ownership acquired these extensive tracts in 1956, they had actually been zoned for agricultural purposes by the board of commissioners of King County. As the various areas were developed by the building and occupancy of residences in the area and the platting of the various districts, zoning changes were made to set aside areas for single-family residences, multi-family residences, clinics, churches and multifarious commercial uses. Indeed, the entire area was zoned from time to time to allow for the type of suburban life and activity which is now so familiar a scene at the rims of the nation's great cities.

In January, 1957, appellant requested the King County planning commission to rezone lots 7 and 8, block 10, Lake Hills Addition No. 3, from a single-residential classification to commercial, B-1, and the planning commission, after conducting public hearings and receiving evidence, complied with the request on March 26, 1957. About two weeks later, on April 8, 1957, the King County board of county commissioners accepted the planning commission's recommendation and, by resolution No. 17229, rezoned the two lots to B-1, for commercial purposes. The lots retained this classification for over a year. These two lots, 7 and 8, are the subject matter of the proceedings at bar.

In August, 1958, some 16 months after the two lots had been rezoned from residential to commercial (B-1), a decision of the superior court cast some doubt upon the validity of the county's zoning regulations. Whereupon, the board of county commissioners speedily enacted, in rapid succession, resolution No. 18800, a comprehensive zoning plan for King County, on August 11th, and resolution No. 18801, a zoning code, on August 12th. It was under this zoning code (resolution No. 18801, § 3.02), that the two lots involved

here were zoned R-A (residential area), and uses allowed were single-family residences. The same resolution permitted properties then in use as commercial properties to be continued as nonconforming uses (resolution No. 18801, § 30.01), but provided that, if such nonconforming uses were discontinued, any future use thereafter must conform to the uses fixed by the zoning code.

At the time of the adoption of the zoning code (resolution No. 18801), the two lots were vacant, unimproved and unused, and bore a large sign which declared in bold letters that they were "Zoned B-1 Business". Despite the message of the sign, however, the zone classification under the resolution of August 12, 1958, was R-A (residential area), and the use permissible was single-family residences.

This R-A classification, single-residence use restriction, remained in effect until January 19, 1959, when the county commissioners promulgated zoning resolution No. 19295, which, by adopting a district zoning map of the south portion of district No. 22 and incorporating the map by reference in the resolution, zoned the two lots B-1, commercial. All property surrounding appellant's property for at least six blocks in any direction came under the R-7.2 classification, including the property of the four respondent householders. The permissive use of this property was limited to single-family residences. B-1, commercial, classification means first commercial under the King County Zoning Code (resolution No. 18801), and would permit the construction of a gasoline service station thereon, together with numerous other uses which will be referred to later.

The crucial resolution, as we have indicated, is resolution No. 19295, which changed the permissive use of appellant's two lots from single-family residential to commercial, B-1.

Things remained quiet on the Lake Hills zoning front for nearly two and one-half years, when, in June of 1961, the appellant owner of the two lots sent surveyors on to the property in preparation for construction of a service station thereon.

Respondent householders reside across the street from the property in single-family residences. When they observed the surveyors on the premises, they made inquiry as to the building intended to be erected thereon, and, upon receiving an answer to their queries, promptly applied to the superior court for a writ of certiorari against King County to have the zoning provisions of the resolution of January 19, 1959 (No. 19295) declared invalid as to the two lots in issue.

Pending hearings upon the petition for certiorari, appellant applied to the King County engineer for a building permit. The county engineer, knowing of the pendency of certiorari, denied the permit, and ascribed the pendency of the certiorari as reason for the denial. Appellant then entered the certiorari proceedings as intervenor, and independently brought a separate action against the county engineer in mandamus to compel the latter to issue to it a building permit.

King County, a municipal corporation, sent up its records and files and made a return to the petition for certiorari to the superior court. The court subsequently entered judgment after trial declaring so much of resolution No. 19295 as purported to zone the two lots from R-A (residential area) to B-1 (commercial) to be null and void from its enactment and, accordingly, denied the writ of mandamus to compel the issuance of a building permit for the erection of a service station.

Together the lots constitute a small tract, approximately 120 feet by 143 feet. They form the apex of a rounded vee intersection. Lots adjoining in all directions for five or six blocks are zoned for single-family residential purposes and were so zoned at the time prior to adoption of resolution No. 19295.

The same resolution which designated appellant's two lots as B-1 (commercial) likewise established a sizable business center eight blocks to the west of appellant's property and a buffer strip for multiple-family dwellings (R-2) between the commercial zone proper and the single-family residential area.

. This appeal raises three particular questions, and their resolution will determine the issues.

1. Assuming that the adoption of a zoning regulation is a legislative function, does certiorari lie to review it?

2. Is a petition for certiorari, brought within two and one-half years of the adoption of a zoning resolution, timely?

3. Does the designation of two lots for commercial purposes in general, and a gasoline service station in particular, in an area reserved and zoned for single-family residences, where the zoning regulations have designated an extensive business district approximately eight blocks away, constitute an invalid type of spot zoning?

Is certiorari a proper remedy to review the actions of a zoning board? Doubt as to the propriety of employing certiorari as a remedy arises from the recognition that the adoption of zoning regulations is a legislative function. Courts have been traditionally reluctant to interfere with the legislative process. This reluctance has, nevertheless, been overcome many times by the requirements of the circumstances. So, whole zoning powers are generally held to be legislative in character, requiring as they do the exercise of legislative judgment and discretion, the courts have, in many jurisdictions, considered certiorari an effective instrument of review where it is shown prima facie that there exists no speedy and adequate remedy at law, and where, in addition, it appears the board or commission acted unreasonably, arbitrarily and capriciously, *i.e.*, in excess of its jurisdiction.

That other remedies, such as injunction, mandamus, quo warranto, or declaratory judgments may be available in zoning problems does not rule out certiorari where it appears that the entire record of the proceedings, leading up to and surrounding the adoption of the regulation claimed to be invalid, will disclose the validity or invalidity of the regulation.

"Certiorari proceedings are ordinarily regarded as appropriate to review decisions of a zoning officer or board. . . . " 58 Am. Jur., Zoning § 233.

The precise question as to the remedy to be pursued was raised in *Holly Development, Inc. v. Board of Cy. Com'rs of Arapahoe Cy.*, 140 Colo. 95, 342 P. (2d) 1032, in which it is said:

"We turn first to defendant's answer brief, which urges that certiorari is not the proper remedy in this case. In this it is in error. Whenever the question is whether a public Board or Commission has exceeded its jurisdiction or abused its discretion, certiorari is the proper remedy to secure a review of its action. Rule 106, R.C.P. Colo. Also see *Board of Adjustment of the City and County of Denver v. Handley, et al.* (1939), 105 Colo. 180, 95 P. (2d) 823; *Kane v. Board of Appeals of City of Medford* (1930), 273 Mass. 97, 173 N.E. 1; *W. L. Clapp v. Knox County, Tennessee* (1954), 197 Tenn. 422, 273 S.W. (2d) 694; *Auditorium Inc. v. Board of Adjustment of Mayor and Council of Wilmington* (1952), 47 Del. 373, 91 A. (2d) 528.

"14 C.J.S. 180, *Certiorari*, § 37a, says:

" ' *   *   * whenever there is no direct remedy provided for review, the writ of certiorari lies, even though some other remedy can be conceived as possible in the future.' "

That certiorari has been long sanctioned as an appropriate remedy to test the validity of the acts of governing boards and commissions is clearly pointed out in *McKenna v. New Jersey Highway Authority*, 19 N. J. 270, 116 A. (2d) 29:

"*Certiorari* is an extraordinary common-law remedy of ancient origin, and has been said to be confined to review of judicial actions. . . . However, in New Jersey, the powers of the Court of King's Bench, the English court existing prior to the American Revolution, were inherited by our former Supreme Court, which was created in colonial days . . . These powers included superintendence over civil corporations, magistrates and other public officers, and in New Jersey the use of the writ in this respect was frequently exercised. . . .

" '[w]hile the statement has frequently been made by our court [referring to the former Supreme Court] that the writ lies to review proceedings of a judicial or *quasi*-judicial character, yet it is extensively used to review the validity of ordinances and of by-laws, which are clearly merely legislative in character . . .' "

Of similar import is *Brown v. Terhune*, 125 N.J.L. 618, 18 A. (2d) 73, wherein it was said:

". . . The properties were in a business zone and prosecutor desired to build a gasoline service station thereon. . . . The grant of the permit was delayed while the zoning ordinance was being amended so as to place the premises in question in a two-family zone where a permit could not be granted.

"*Certiorari* is the appropriate remedy to test the reasonableness of the ordinance. . . . The change in the zoning ordinance seems to bear no relation to the public health, safety, morals or general welfare. . . ."

See, also, *Linden Methodist Episcopal Church v. City of Linden*, 113 N.J.L. 188, 173 Atl. 593; *Eastern Boulevard Corp. v. Board of Com'rs of Town of West New York*, 124 N.J.L. 345, 11 A. (2d) 832; *Board of Zoning Appeals of Decatur v. Decatur, Ind. Co. of Jehovah's Witnesses*, 233 Ind. 83, 117 N. E. (2d) 115.

This court has passed upon the question in *State ex rel. Lyon v. Board of Cy. Com'rs of Pierce Cy.*, 31 Wn. (2d) 366, 196 P. (2d) 997, where, in a challenge to the issuance of a variance permit by the board of county commissioners allowing the operation of a tavern in an otherwise interdicted zone, we said:

"The remedy by certiorari is available where there is no right of appeal and if, in the judgment of the court, there exists no plain, speedy, and adequate remedy at law. . . .

". . .

"It is significant that practically all proceedings to secure court review of the granting of variance permits, except where an appeal procedure is specifically provided for, are by certiorari. . . ."

A purpose of certiorari is to review the official acts of a public officer, or an organ of government. Its method is direct, precise, and definitive. Allowing others to intervene—though they may be vitally affected by the results—does not make the attack a collateral one, and, thus, require a different remedy to test the validity of official actions. When appellant came into the case as inter-

venor, it did not thereby convert the attack on resolution No. 19925 from direct to collateral. It is our view, then, that certiorari is a proper remedy to review the actions of the King County board of commissioners in adopting the zoning resolution.

Appellant strongly urges that, even though certiorari may lie, it was not timely brought in the instant case since the respondent householders did not bring this action until approximately two and one-half years after the adoption of the zoning regulation of which they complain.

Was this petition for certiorari timely brought?

Did the delay in maintaining the action set up an estoppel against the respondent householders?

Were they guilty of laches as to deprive them of their action in the first instance?

■ Questions of laches and estoppel occur frequently in zoning cases. The principal element in applying laches is not so much the period of delay in bringing the action but the factor of resulting prejudice and damage to others. Thus it was held in *Auciello v. Stauffer*, 58 N. J. Super. 522, 156 A. (2d) 732, that a delay of nearly three years in bringing an action against the builder of a garage in violation of the zoning code, acting under a void permit, was not untimely since the right to prevent actions taken under an authority which is void is not affected by the lapse of time. Of similar import is the holding in *Forbes v. Hubbard*, 348 Ill. 166, 180 N. E. 767, where mandamus was brought to compel the issuance of a building permit under a zoning ordinance. The court stated:

"Counsel for appellants argue that as appellee purchased this property after the passage of the zoning ordinance he should not now be heard to complain that that ordinance is invalid. We know of no rule of law that creates an estoppel against attack by such purchaser on the validity of a zoning ordinance unless there be in his acts or the acts of his grantor that which of themselves would estop him. . . . It is likewise thoroughly established that mere acquiescence, regardless of the period thereof, cannot legalize a clear usurpation of power which offends against the constitution adopted by the people. . . ."

The principle is summarized in the following statement from 8 McQuillin, Municipal Corporations (3d ed., Rev.) § 25.291, at p. 724:

". . . A right to attack zoning that is clearly a usurpation of power and an invasion of property with no relationship to the public health, safety, morals or welfare is not lost by acquiescence regardless of the period thereof. . . ."

Appellants cite a number of cases from this state to the effect that certiorari must be brought within the time during which an appeal would lie, and rely upon *State ex rel. L. L. Buchanan & Co. v. Washington Public Ser. Comm.*, 39 Wn. (2d) 706, 237 P. (2d) 1024; *State ex rel. Lyon v. Board of Cy. Com'rs of Pierce Cy.*, *supra*; *State ex rel. von Herberg v. Superior Court*, 6 Wn. (2d) 615, 108 P. (2d) 826; *State ex rel. Clark v. Superior Court*, 167 Wash. 481, 10 P. (2d) 233; and *State ex rel. Neal v. Kauffman*, 86 Wash. 172, 149 Pac. 656.

We confirm the rule in the above cited cases to the effect that, where certiorari is taken from an inferior court to a superior court, the time within which certiorari must be brought shall be determined by the time allowable for an appeal as prescribed by statute or rule of court. But we should point out that this rule is limited to cases arising in the courts, or in other judicial proceedings, where the direct notice of the pendency thereof to the parties involved is jurisdictional. Service of process and notice of the pendency of the action are indeed the *sine qua non* of due process and, hence, are jurisdictional in judicial proceedings. This rule of timeliness should not apply to a review of a zoning regulation.

Indeed, even in a case arising from the courts, the rule that limits certiorari to the time within which an appeal could have been taken did not govern. In *State ex rel. Lowary v. Superior Court*, 41 Wash. 450, 83 Pac. 726, review of an order appointing a guardian for an incompetent person was sought by certiorari more than a year after the order had issued. Petitioner there showed the court that, at the time the order of appointment was entered, petitioner

was ill, impoverished and incompetent, and that no notice of the intent to appoint the guardian had ever been served upon the person having custody of the petitioner as was required by statute. Petitioner was accordingly deemed to have been without notice of the guardianship proceedings. We held that certiorari was not only a proper remedy, but it was not subject to the defense of laches.

In considering laches, estoppel, waiver and other equitable defenses, the rules governing the timeliness for commencement of certiorari to review a judicial proceeding do not apply to a review of the acts of public authorities having the power to adopt and promulgate zoning regulations.

■ The rule affecting laches in a review of zoning is, and should be, different. When a review of the legislative action of a zoning authority is sought in a zoning case and the actions of the zoning authority under review are of such a nature that the record of the proceedings discloses their validity or invalidity, time for certiorari is not then limited to the time in which an appeal could have been taken from the official action of the zoning authority. If petitioners are in a situation where they would not normally be expected to learn of the legislative action, where they are directly affected by it, and where they do not have actual knowledge, the time for the commencement of certiorari begins with acquisition of knowledge or with the occurrence of events from which notice ought to be inferred as a matter of law. A different rule would permit zoning departures of the most drastic nature from the comprehensive zoning plan and would leave persons most detrimentally affected thereby without redress in the courts against arbitrary legislative action.

■ Two separate occurrences here could well serve as the events from which the time for the commencement of certiorari would run—(1) the start of surveying activities by appellant within the view of respondent neighboring householders, and (2) appellant's application to the King County engineers for a building permit to construct a gasoline service station.

As to the second event, it has been held that, where a permit to construct a 12 story apartment building was issued by the city of Seattle on the day before an amendatory ordinance went into effect limiting the height of buildings in the area to 35 feet, injunctions against the apartment house construction did not lie. The right to build the same vested when the permit was applied for. An owner of property has a vested right to put it to a permissible use under a valid and subsisting ordinance. The right accrues at the time an application for a building permit is made. *Hull v. Hunt*, 53 Wn. (2d) 125, 331 P. (2d) 856; *State ex rel. Ogden v. Bellevue*, 45 Wn. (2d) 492, 275 P. (2d) 899.

On the basis of this authority, we hold that the time began with the occurrence of the earlier of the two events here mentioned, either (1) the application for a building permit or (2) knowledge of intent to build on the lots in question brought to the petitioners through their seeing the Eastgate surveyors on the lots. Since the petition was brought within two months of either event, petitioners are not precluded through laches or estoppel from maintaining this petition.

Integrally connected with the propositions of remedy here is the ultimate question as to whether the trial court, from the record itself, well found the zoning of lots 7 and 8 to be a spot zoning, and, therefore, invalid. To answer this question, we must look to the purpose and operation of the zoning laws.

Scarcely a generation has passed since the adoption of the first zoning statute in this state in the year 1935. Laws of 1935, chapter 44, p. 115; RCW 35.63. We have now entered upon an era which demonstrates conclusively the wisdom of the foregoing enactment. This act of the legislature, coming as it did at a time when the state and the nation were caught in the throes of a deep economic depression, found millions of people unemployed and building construction at nearly a standstill. With the nation's economy and business at a point of stagnation, problems of the most urgent necessity were created for the legislature, which, despite the exigencies of the times, demonstrated a fore-

thought to look ahead to a brighter day in spheres which then must have appeared to be of minor importance.

The judgment of the legislature in this respect has been vindicated. Less than 30 years after the enactment of the first zoning statute in the state, we find ourselves in an era characterized by vast movements of people and goods across the continent, East to West, and North to South, an era of great super highways to speed the migration along, a period of movement unparalleled in history from the farm to the city and a counter-migration from the city to the suburbs. We are in a time when all of the nation's cities are being rimmed with gigantic housing developments, each requiring its quota of business services, recreational establishments, schools, hospitals, clinics, churches, banks, and varied components of a modern city. One wonders what the picture would be had no zoning statutes been enacted.

In the past 40 years, to accommodate these vast changes and to provide for an orderly and sensible channelization of the tremendous economic and social forces generated by these movements, the courts have erected within the framework of both the common and municipal law of this country a new body of law known as the zoning law. So firmly founded is this structure and so generally well recognized is the proposition that the zoning laws of the country are directly connected with the maintenance of public peace, morals and safety and in furtherance of the general welfare, no party to this action has challenged the constitutionality of the state's zoning statute or the general zoning resolution itself. Only the application of resolution No. 19925 as it purports to change the use of the two lots involved from single-family residential (R-A) to commercial (B-1) is at issue here.

■ Nevertheless, despite the beneficial results and the public necessity involved in the establishment of the zoning laws, they constitute a serious impairment of the right to use and enjoy property, and they do interfere with the possession thereof. Thus, as we have indicated, such impairment and interference must be directly related to the public health, safety and morals and the general welfare

to be sustained. This language is employed in the zoning act itself as codified in RCW 35.63.080. *State ex rel. Warner v. Hayes Inv. Corp.*, 13 Wn. (2d) 306, 125 P. (2d) 262; *Lillions v. Gibbs*, 47 Wn. (2d) 629, 289 P. (2d) 203; and *Hauser v. Arness*, 44 Wn. (2d) 358, 267 P. (2d) 691.[1]

When King County adopted its zoning resolution No. 18800 on August 11, 1958, it included as an integral part thereof a comprehensive plan as a general design for the future growth of the county. It also expressed therein its purposes to keep the zoning laws well within the constitutional limitation of the police power in the following language:

"The ingredients of an ideal neighborhood are a rather solid pattern of homes, linked by quiet streets and centered about an elementary school and a park. A small neighborhood shopping location may be spotted near the *edge* of the neighborhood.

" . . .

" . . . We work to avoid crowded living conditions, the splitting of the neighborhood by arterial highways, and the development of commercial and industrial establishments which would unnecessarily encroach in residential areas.

" . . .

"The location of shopping areas should, generally, be such that protection is given to residential areas from business encroachment while at the same time locating them in areas most convenient to potential customers.

" . . . Generally, *spotty* and strip type development should be discouraged.

" . . .

"As to actual location of new business districts, the Commission recommends that the most logical location would be at the junction of the arterial streets *bordering* neighborhoods. A pattern of neighborhood, community, and regional business centers would likewise appear logical when placed near the common or abutting corners of several neighborhoods." (Italics ours.)

---

[1] For a penetrating study in succinct form which shows where we have been, where we are tending, and the direction we should take in the law of zoning, read Arval Morris, Toward Effective Municipal Zoning, 35 Wash. L. Rev. 534 (1960).

This comprehensive plan was in effect in respondent householders' neighborhood when respondents first observed appellant's surveyors on the two lots.

■ If, then, the portions of resolution No. 19925, which purported to zone the two lots B-1, commercial, constitute spot zoning as the law defines it, those portions of the resolution which do so would be a nullity *ab initio* and subject to review not only by certiorari but they would also place upon the courts the duty of so declaring them categorically. The maps, resolutions and documents furnished and made a part of King County's return to the writ of certiorari show lots 7 and 8 are in the heart of a residential district. They are neither contiguous to nor constitute an extension of any other business property. The uses permitted under the zoning code of King County, pursuant to resolution No. 18801, § 17, under the classification B-1, would allow not only a service station but also structurally enclosed animal hospitals and clinics, beer parlors, cabarets, taverns, employment agencies, business and professional offices, lumber and fuel yards (if surrounded by an 8-foot fence), and numerous other activities constituting a total of 27 different classifications. B-1 zoning (commercial) would also allow the construction of buildings up to 35 feet in height.

Do we have here a spot zoning? Is it spot zoning of such a character as to be deemed an arbitrary and capricious legislative act?

The concept of spot zoning as an evil in the field of municipal growth is well recognized by nearly all authorities.

"Spot zoning is an attempt to wrench a single lot from its environment and give it a new rating that disturbs the tenor of the neighborhood, and which affects only the use of a particular piece of property or a small group of adjoining properties and is not related to the general plan for the community as a whole, but is primarily for the private interest of the owner of the property so zoned; and it is the very antithesis of planned zoning. It has generally been held that spot zoning is improper, and that one or two building lots may not be marked off into a separate district or zone and benefited by peculiar advantages or subjected to peculiar burdens not applicable to adjoining similar lands." 101 C.J.S., Zoning § 34.

A well supported statement is also found in 2 Metzenbaum, Law of Zoning (2d ed.) chapter X-m-(5):

" 'Spot Zoning' is not usually favorably regarded, because, in too many instances, such practice has been employed in order to aid some one owner or parcel or some one small area, rather than being enacted for the general welfare, safety, health and well-being of the entire community. . . .

"  .  .  .

" 'Spot zoning' merely for the benefit of one or a few or for the disadvantage of some, still remains censurable because it is not for the *general* welfare  .  .  . "

The noted authority on municipal law, Charles S. Rhyne, states:

" 'Spot zoning' has come to mean arbitrary and unreasonable zoning action—commonly by an amendment to a zoning ordinance, but also by the zoning ordinance itself, or, less commonly, by grant of a permit for a use other than the regular zone uses—by which a lot or small area is singled out and specially zoned for a use classification totally different and inconsistent with the classification of surrounding land indistinguishable from it in character, thus creating a mere island or 'spot' non-conforming use within the larger use zone, with a resulting new rating that disturbs the tenor of the neighborhood. 'Spot zoning' is thought of as zoning not in accordance with a comprehensive plan, but for mere private gain to favor or benefit a particular individual or group of individuals and not the welfare of the community as a whole, and thus in effect granting by amendment, a special exception or variance from general regulations. 'Spot zoning' of this nature has been found unauthorized, discriminatory, and invalid and an unlawful usurpation of the power to grant a variance.  .  .  . " Rhyne, Municipal Law, chapter 32, p. 810, 825.

For similar statements from works of equal standing, see 1 Yokley, Zoning Law and Practice (2d ed.) § 90, and 8 McQuillin, Municipal Corporations (3d ed., Rev.) §§ 25.83, 25.84.

Thus it is that experts in the field of zoning law condemn spot zoning with rare exception. This court has denounced spot zoning categorically as follows:

"It should be here noted that 'spot' zoning such as that done by the city in 1937 is almost universally condemned, and, since it is generally difficult to justify under the police-power concept, many spot zoning ordinances have been vulnerable to attack, although the courts have been careful not to lay down any hard and fast rule that all spot zoning is illegal. . . ." *State ex rel. Miller v. Cain,* 40 Wn. (2d) 216, 225, 242 P. (2d) 505.

The foregoing case is an even stronger criticism of spot zoning than one might suppose on a casual reading, because it further holds that, where an incident of spot zoning has been completed, it does not thereby open the gates to other spot zoning.

"But when a spot rezoning is a *fait accompli,* it does not justify additional spot rezoning for the benefit of other property owners who may conceive themselves to be similarly situated. It has quite uniformly been held that permitting some persons to violate a zoning regulation does not preclude its enforcement against others. [Citing cases.]" *State ex rel. Miller v. Cain, supra.*

█ We agree with the text writers and specialists in the field of zoning law that spot zoning has come to mean arbitrary, capricious and unreasonable zoning action, and that it is commonly achieved by means of an amendment to a zoning ordinance, as was the precise case here. Where, as in the present situation, the zoning authority by official legislative action designates two lots for a gasoline service station in the heart of a neighborhood of single-family residences already served by commercial and business facilities or subject to be so served in accordance with a comprehensive plan or scheme, such designation is patently a spot zoning; and where the record discloses no basis for such a zoning in furtherance of the public health, safety, or morals, or a contribution either to the general welfare of the people in the area or at large, the zoning is so clearly a spot zoning as to make it arbitrary, capricious and unreasonable. It was, and is, therefore, void.

Inasmuch as mandamus for a building permit was brought under a void section of the resolution, the judgment of the trial court in denying the writ is also sustained.

The judgment of the trial court is, accordingly, affirmed in each case.

OTT, C. J., FINLEY, ROSELLINI, and HUNTER, JJ., concur.

October 24, 1963. Petition for rehearing denied.