# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| WALLACE R. JOHNSON, as Trustee of the 1994 WALLACE RAY JOHNSON and JOAN ANNETTE JOHNSON REVOCABLE LIVING TRUST, | No.  52688-3-II |
| Appellant, | |
| v. | |
| 48TH COURT NW HOMEOWNERS ASSOCIATION, a non-profit corporation and BERNARD MCAULEY and LINDA MCAULEY, husband and wife, | UNPUBLISHED OPINION |
| Respondent. | |

LEE, C.J. — Wallace Johnson appeals the superior court's ruling granting Bernard and Linda McAuley's motion for summary judgment and dismissing Johnson's claims with prejudice. Johnson argues that (1) the doctrine of laches does not apply, (2) the existence of the allegedly modular house and nonconforming barn is a continuing tort, (3) the McAuleys' boarding of horses is a nuisance per se, and (4) the McAuleys' boarding of horses is a nuisance.  Because the doctrine of laches applies, we affirm.

## FACTS

Johnson and the McAuleys are neighbors in a development that is governed by the 48th Court NW Homeowners' Association (HOA).  The McAuleys built their home and barn between 1994 and 1995.  Johnson purchased his property in 1995 and moved onto the property in 2007.

The applicable covenants went into effect in July 1994. These stated, in relevant part:

> Section 2. Residential Area Covenants
> A.  Land Use and Building Type for Single-Family Residences: No structure shall be altered, erected, placed, or permitted to remain on any lot, other than one detached single-family dwelling not to exceed two (2) stories, and outbuildings which may include barns, shops, or other related outbuildings. All structures shall conform to the architectural scheme of the main dwelling on the lot. No mobile homes or modular homes will be allowed.
>
> . . . .
>
> F.  Nuisances: No noxious or offensive activity shall be carried out upon any lot, nor shall anything be done thereon which may be, or may become, an annoyance or nuisance to the neighborhood.
>
> . . . .
>
> K.  Businesses: No type of businesses shall be conducted on any lot or within any dwelling or structure that is visible to the public view. No forms of advertising shall be allowed that are visible to the public view.

Clerk's Papers (CP) at 25-27.

The HOA was formed in 2008. The HOA modified the covenants in 2013. These modified covenants added to Section 2(A): "Any and all buildings constructed and completed prior to August 26, 2008 will be permitted to remain on the lot as originally constructed." CP at 67.

Johnson was the president of the HOA from 2008-2012. In 2012, Johnson was voted out as President of the HOA.

In October 2012, Johnson confronted Bernard[1] about his modular home being in violation of the covenants. Johnson also believed the McAuleys were operating a horse boarding business in violation of the covenants. When Johnson was President of the HOA from 2008 to 2012, he

---

[1] Because two parties share the same last name, first names will be used for clarity. No disrespect is intended.

never took official action on behalf of the HOA against the McAuleys' home or barn or the McAuleys' use of the barn.

In May 2013, after he had been voted out as President of the HOA, Johnson began to send letters to the McAuleys and the HOA Board about the McAuleys' alleged violation of Section 2(K) of the covenants by running a horse-boarding business on their property. One letter stated that the horse boarding was a nuisance because there was increased traffic from "horse owners coming to pick up and return horses," and because riders on horseback were in the street and cutting through lots. CP at 47. The letter did not say that any horseback riders had cut through Johnson's lot.

On September 17, 2013, the HOA held a meeting to determine whether the McAuleys were violating the covenants. After hearing from Johnson and the McAuleys, six of the nine lot owners stated that they did not believe that the McAuleys were violating the protective covenants, two abstained, and Johnson did not vote at all.

The HOA held votes as to the McAuleys' alleged covenant violations two more times in 2015 and 2016. Both times, the members voted that there were no covenant violations or infractions.

On August 12, 2016, Johnson filed a complaint against both the HOA[2] and the McAuleys stating, in relevant part:

> 3.5. MCAULEY violated the protective covenants from the time they put a modular home on their property as their main dwelling, then subsequently constructed a barn on the property that does not conform to the architectural scheme of the main dwelling, then conducted a horse boarding business on the lot that is visible to public view.
>
> . . . .
>
> 3.12. MCAULEY has their property, modular home and barn listed for sale. If the nuisance is not abated prior to sale, the buyer of the MCAULEY property will be

---

[2] These claims are not challenged on appeal.

stepping into a problem that MCAULEY or the HOA should disclose to a potential purchaser.

3.15. Having the MCAULEY nuisance in the development causes a reduction in market value to the JOHNSON TRUST property and therefore caused damage to Plaintiff in an amount to be proven at trial.

. . . .

4.5. Nuisance – RCW 7.48.120. MCAULEY operates a horse riding and boarding facility without permit and in violation of Thurston County Code 20.54; specifically 20.54.070(16)(b)(iii). Violation of a local zoning ordinance or land use code is a nuisance per se and is not permissible or excusable under any circumstance. The HOA has knowingly allowed and even supported McAuley in continuing this nuisance. This nuisance annoys, injures or endangers the comfort and repose of Plaintiff.

CP at 1-8. The McAuleys filed a motion for summary judgment to dismiss Johnson's claims. The McAuleys argued that Johnson's claims were barred by the doctrine of laches and that the use of their barn was neither commercial nor a nuisance.

A.    JOHNSON'S CHALLENGE TO THE HOUSE AND BARN

The McAuleys purchased their property on October 13, 1994. Their home was built between October 1994 and February 1995. Exterior wall panels, interior wall panels, roof trusses, cabinets, doors, and millwork were constructed off-site. The house does have pre-fabricated walls. The McAuleys claim the home is not modular.

The McAuleys' barn was built on their lot from February 7, 1995 through March 16, 1995. Bernard McAuley declared that "regular maintenance has been conducted on both the barn and the residence," but "there have been no substantial changes in design since the buildings were completed." CP at 342.

Johnson contends that the McAuleys' home was modular because "[i]t is obvious to anyone with knowledge of home construction . . . . I can tell that from my own observation." CP at 79. Johnson declared that he has continually tried to get the McAuleys to comply with the covenants

4

since Johnson purchased his property. Johnson claims he told Bernard before the HOA was formed in 2008 that the McAuleys' home and barn were in violation of the protective covenants. When Johnson confronted Bernard about the violation, Bernard stated that the protective covenants "'weren't worth the paper they are written on.'" CP at 288. Johnson opined that the McAuleys' nuisance caused a reduction in market value to the Johnson Trust property. Johnson also opined that he has had a loss of value of his property from $100,000 to $150,000 at a minimum. And Johnson stated that Pam Almaraz had to reduce the sales price of her property by over $100,000 due to the McAuleys' violation of the covenants.

Pam Almaraz, another member of the HOA declared that the McAuleys' barn did not follow the architectural scheme of the house. Almaraz claimed that Bernard told her in 2000 that he had to increase the size of his home "'because of the covenants.'" CP at 314. According to Almaraz, at a 2012 HOA meeting, it was apparent that there was not much regard for the covenants among the homeowners.

In support of his summary judgment argument, Johnson provided the standard frame package specifications that were used to build the McAuleys' house. He also provided the following definitions of modular homes: "Modular construction is a process in which a building is constructed off-site, under controlled plant conditions, using the same materials and designing to the same codes and standards as conventionally built facilities." CP at 446. "[A modular home] is a home constructed in a factory, away from your property, in a controlled environment and then delivered to your job site. 'Modular home' is the most common term used, but they are also known as—systems-built homes, factory-built and off-site construction." CP at 448.

B.    JOHNSON'S CHALLENGE TO HORSE BOARDING

The McAuleys kept four horses for other people, one per owner. Bernard declared that,

For most of the last twenty years, we have had one horse boarded in our barn which [was] always owned by a friend. However, we never had more than two horses we did not own boarded in the barn at any given time. Although we pooled costs with the other owners for grain, hay and other necessaries needed to care for the horses, the barn was never operated as a for-profit business. No advertising or signage was ever used, nor were any horses rented or events held on the premises.

CP at 342. Of the four people who kept their horses at the McAuleys', two payed the McAuleys $240 per month while the McAuleys provided all hay, grain, and other items, which cost the McAuleys $910 per month. Two other people paid an amount based on costs of hay, grain, and pellets. The McAuleys did not have a special use permit to keep the horses on their property.

Johnson claimed that the business was visible to the public. On September 18, 2013, pursuant to Johnson's complaint alleging the McAuleys had an unpermitted barn structure and commercial horse boarding business, Thurston County conducted a site review and found no violations. The inspection also found that there had been a boarding business in the past, but not currently.

On August 6, 2015, a second inspection by Thurston County was conducted based on a complaint that the barn was not permitted and that the McAuleys were operating a commercial horse-boarding business. The County found that the buildings were permitted and that no events occurred on site. Specifically, the County found that the McCauleys "board 2 horses—1 = prop. owners . . . no violations." CP at 348.

C.   SUPERIOR COURT RULING

On December 1, 2017, at the summary judgment hearing, the superior court ruled that there was a laches problem. It also ruled that the nuisance per se claim failed on the merits. The superior court dismissed Johnson's claims against the McAuleys with prejudice.

Johnson appeals.

6

ANALYSIS

A.     STANDARD OF REVIEW

We review summary judgment orders de novo. *Ranger Ins. Co. v. Pierce County*, 164 Wn.2d 545, 552, 192 P.3d 886 (2008). Summary judgment is appropriate if, when viewing the facts in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); *Michael v. Mosquera-Lacy*, 165 Wn.2d 595, 601, 200 P.3d 695 (2009). A genuine issue of material fact exists when reasonable minds could reach different conclusions. *Michael*, 165 Wn.2d at 601. "Mere allegations or conclusory statements of facts unsupported by evidence do not sufficiently establish such a genuine issue." *Discover Bank v. Bridges*, 154 Wn. App. 722, 727, 226 P.3d 191 (2010).

B.     DOCTRINE OF LACHES

Johnson argues that the doctrine of laches was inappropriately applied in this case. The McAuleys argue that Johnson had knowledge of the structures built on their property and unreasonably delayed bringing a cause of action for more than 20 years. Additionally, the McAuleys argue that they have been prejudiced by this delay because they have "improved their property, maintained their property, and enjoyed their property for that entire period of time." Br. of Resp. at 10.

The doctrine of laches is "a creature of equity." *Rutter v. Rutter*, 59 Wn.2d 781, 785, 370 P.2d 862 (1962). "Determining whether injury cognizable under the doctrine of laches occurs depends on assessing the inherent equities of a particular case." *Brost v. L.A.N.D., Inc.*, 37 Wn. App. 372, 376, 680 P.2d 453 (1984). The burden of proof is on the party asserting laches. *Rutter*, 59 Wn.2d at 785.

In *Automotive United Trades Org v. State*, 175 Wn.2d 537, 542, 286 P.3d 377 (2012), our Supreme Court set forth the general elements of laches: "'1) inexcusable delay and 2) prejudice to the other party from such delay.'" (quoting *State ex rel. Citizens Against Tolls v. Murphy*, 151 Wn.2d 226, 241, 88 P.3d 375 (2004)). "Laches is an implied waiver arising from knowledge of existing conditions and acquiescence in them." *Buell v. Bremerton*, 80 Wn.2d 518, 522, 495 P.2d 1358, 1361 (1972). It arises from "neglect for an unreasonable length of time, under circumstances permitting diligence to do what in law should have been done." *Arnold v. Melani*, 75 Wn.2d 143, 147, 449 P.2d 800 (1968). *See also Edison Oyster Co. v. Pioneer Oyster Co.*, 22 Wn.2d 616, 628, 157 P.2d 302 (1945). "Mere delay, lapse of time and acquiescence do not defeat the remedy unless so long continued that in a particular case its changed condition would make it inequitable to allow recovery." *McKnight v. Basilides*, 19 Wn.2d 391, 401, 143 P.2d 307 (1943). "[T]he main component of the doctrine is not so much the period of delay in bringing the action, but the resulting prejudice and damage to others." *Clark County Public Utility Dist. No. 1 v. Wilkinson*, 139 Wn.2d 840, 849, 991 P.2d 1161(2000) (citing *Pierce v. King County,* 62 Wn.2d 324, 332, 382 P.2d 628 (1963); *Vance v. City of Seattle,* 18 Wn. App. 418, 425, 569 P.2d 1194 (1977)).

Here, the McAuleys constructed their home in 1994 and 1995. They built the barn in 1995. The Johnsons bought their property in 1995 and moved onto the property in 2007. Johnson stated that he knew that the McAuleys' home was modular because "[i]t is obvious to anyone with knowledge of home construction." CP at 79. He also stated he knew that horses were being boarded because it was in public view. Johnson filed his complaint in 2016, more than twenty years after he bought the lot.

Although Johnson claims he told Bernard before the HOA was formed in 2008 that he believed the McAuleys' home and barn violated the covenants, Johnson never took any official

action on behalf of the HOA against McAuleys with regard to the construction of their home or barn or the use of the barn, even when he was the President of the HOA from 2008-2012. In fact, the HOA modified the covenants in 2013 to allow the buildings on the McAuleys' lot to remain as constructed. Also, although Johnson claims he began to complain about the McAuleys' to the HOA in 2013, there is nothing in the record to show that Johnson took any action, or reasons why he took no action, against the McAuleys for 18 years, from 1995, when Johnson bought his property, to 2013. These facts show an inexcusable delay in bringing the cause of action.

The McAuleys lived in and enjoyed their home; were responsible for the cost of upkeep and maintenance of their house and barn; and kept horses on their property for twenty years. The HOA never brought any action against the McAuleys, and the McAuleys' home is in compliance with the modified HOA covenants. In assessing the inherent equities of this case, there is prejudice to the McAuleys if Johnson is now allowed to continue in his suit after an unreasonable delay in bringing this action. Therefore, we hold that the doctrine of laches applies, and that the superior court did not err in granting summary judgment and dismissing Johnson's claims.

## ATTORNEY FEES

The McAuleys request attorney fees on appeal.

Under RAP 18.9(a), this court can award attorney fees for the filing of frivolous appeals. An appeal is frivolous when the appeal presents no debatable issues on which reasonable minds could differ and is so lacking in merit that there is no possibility of reversal. *Stiles v. Kearney*, 168 Wn. App. 250, 267, 277 P.3d 9, (citing *Mahoney v. Shinpoch,* 107 Wn.2d 679, 691, 732 P.2d 510 (1987)), *review denied*, 175 Wn.2d 1016 (2012). Here, we exercise our discretion and deny the McAuleys' request for attorney fees on appeal.

No. 52688-3-II

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

, C.J.
Lee, C.J.

I concur:

Cruser, J.

WORSWICK, J. (dissenting) — Laches is an equitable defense courts apply to protect a defendant from an unreasonable prejudicial delay. *Rutter v. Rutter's Estate*, 59 Wn.2d 781, 784-85, 370 P.2d 862 (1962); *Clark Cty. Pub. Util. Dist. No. 1 v. Wilkinson*, 139 Wn.2d 840, 848-49, 991 P.2d 1161 (2000). Bernard and Linda McAuley, who assert the defense, have the burden of proof. *Newport Yacht Basin Ass'n of Condo. Owners v. Supreme Nw.*, *Inc.*, 168 Wn. App. 56, 77, 277 P.3d 18 (2012). Because the McAuleys have failed to prove any damage caused by Wallace Johnson's unreasonable delay, I would reverse. Thus, I respectfully dissent.

Laches is an extraordinary remedy that is sparingly employed. *Brost v. L.A.N.D.*, *Inc.*, 37 Wn. App. 372, 376, 680 P.2d 453 (1984). To successfully employ the doctrine of laches, a defendant is required to show three elements, one of which is damage or prejudice resulting from the unreasonable delay. *Lopp v. Peninsula Sch. Dist. No. 401*, 90 Wn.2d 754, 759-60, 585 P.2d 801 (1978). Laches will not successfully bar a claim unless the defendant has proven that he has so altered his position that it would be inequitable to enforce the claim. *Rutter*, 59 Wn.2d at 785. Mere delay, lapse of time, and acquiescence are insufficient to establish laches. *Rutter*, 59 Wn.2d at 785.

Here, the McAuleys built their home and barn between 1994 and 1995. And although Johnson purchased his property in 1995, he did not move onto the property until 2007. The McAuleys do not claim as damages the cost of building their home and barn. They assert only that they have been prejudiced by delay because they have "improved their property, maintained their property, and enjoyed their property for that entire period of time." Br. of Resp't at 10. The majority also cites the McAuleys' boarding of horses as a type of prejudice. Majority at 9. I fail to see how enjoyment of property can constitute damages or prejudice. Moreover, other than standard maintenance, evidence of property improvements is missing from our record on appeal.

I agree that Johnson delayed an extraordinarily long time before bringing this suit. I also find it troublesome that Johnson took no enforcement action against the McAuleys until after Johnson was voted out as president of the 48th Court NW Homeowners Association. However, I cannot agree that the damages or prejudice proven in this case sufficiently support a laches defense. I would reverse.

_____
Worswick, J.