[No. 41145.     En Banc.     February 4, 1971.]

J. T. CHROBUCK *et al., Respondents,* v. SNOHOMISH COUNTY *et al., Appellants.**

*Reported in 480 P.2d 489.

*Robert E. Schillberg, Eugene Butler,* and *Joseph Meagher,* for appellants.

*Hodge, Dahlgren & Hillis,* for respondents.

HAMILTON, C. J.—This is an appeal from a judgment of the superior court voiding the action of the Planning Commission and the Board of County Commissioners of Snohomish County, Washington, in amending a comprehensive plan and rezoning a given area from a rural and residential type classification to a heavy industrial classification.

The facts essential to a resolution of the appeal may be summarized in the following manner:

Commencing in 1956, defendant Atlantic Richfield Company, hereafter referred to as Atlantic Richfield, acquired approximately 2,100 acres of land embracing some 2,000 lineal feet of beach frontage in the immediate vicinity of Kayak Point on Port Susan Bay of Puget Sound. The acreage is situated in Snohomish County, approximately 7 miles south of the town of Stanwood, some 15 miles north and west of the city of Everett, and easterly—across Port Susan Bay—of Camano Island.

The property is located within the Stanwood Planning Area of Snohomish County's Comprehensive Plan for zoning. The comprehensive plan text for the Stanwood Planning Area, promulgated in 1964, designated the Atlantic Richfield property and the surrounding area as rural and residential, and the implementing zoning ordinance classi-

fied it as Rural Use, a residential and agricultural type of zone as established in the Snohomish County Zoning Ordinance.

Since the zoning in 1964, the waterfront areas bordering on Port Susan Bay to the north and immediate south of the Atlantic Richfield property have, as access became available, developed as prime residential and recreational sites, as has the east shore of Camano Island. Likewise, Lakes Howard, Goodwin, Shoecraft, and Ki lying, respectively, to the north and east of the inland perimeter of Atlantic Richfield's property have experienced waterfront residential growth, with an increasing transition from summer cottages to permanent residences. The remainder of this portion of the Stanwood Planning Area is rather sparsely settled, although with the increased population and industrial expansion in the vicinity of the city of Everett greater residential utilization is foreseeable. Access to the Atlantic Richfield property at all times concerned consisted of one secondary paved county road running generally north and south, known as the Warm Beach Road, and a graveled road, Fire Trail Road, running east and west along the southern boundary of the property.

In mid-1967, Atlantic Richfield publicly announced it proposed to construct and operate an oil refinery on its property in the immediate vicinity of Kayak Point. Thereafter, in September, Atlantic Richfield requested Snohomish County to amend the comprehensive plan to permit a rezoning of the pertinent portion of its property from its rural residential classification to a heavy industrial designation to enable the proposed installation. The application was duly referred to the Snohomish County Planning Department for review and recommendation and a public hearing before the Snohomish County Planning Commission was scheduled to commence November 30, 1967.

At the public hearing, which commenced as scheduled on November 30 and extended through December 1, 1967, plaintiffs, property owners situated in varying proximity to the area proposed to be utilized for an oil refinery, were represented by counsel and appeared in opposition to the

requested amendment of the comprehensive plan. Atlantic Richfield, as a proponent of the amendment, was likewise represented by counsel. At the outset of the hearing all counsel for the respective interested parties were advised by the chairman of the planning commission that cross-examination of any witnesses testifying during the hearing would not be permitted.

The hearing opened with the introduction of the study of the proposal conducted by the Snohomish County Planning Department and the recommendation of that department that Atlantic Richfield's application be denied. This recommendation was predicated upon the department's belief that the area involved was topographically unsuited for heavy industry and that the proposed location of an oil refinery on the site, with the portent of future expansion, was incompatible with the existing and future residential and recreational attributes of the surrounding area.

Atlantic Richfield then introduced evidence, including the testimony of Mr. L. F. Strador, vice-president of Atlantic Richfield, describing the nature and characteristics of the oil refinery and dockage installation proposed as well as the controls which would be utilized to minimize visual impact, noise, odor, water pollution and oil spillage. In this vein, Atlantic Richfield indicated an immediate need for only 660 acres for the main refinery facilities, including a narrow strip of beach frontage off Kayak Point to afford dockage for incoming and outgoing oil tankers. Further evidence bore upon the sources of water supply and electrical energy which would be looked to, and the additional local fire control services, employment opportunities, improved access, and tax advantages which could be derived as a result of the proposed installation. Counsel for Atlantic Richfield stated that if the company could not utilize the proposed Kayak Point site it would have to go elsewhere than Snohomish County in placing its refinery.

Plaintiffs were then allowed to present their contentions and evidence, by which they reechoed the concerns of the Snohomish County Planning Department survey, and emphasized the existing and expanding residential and recrea-

tional usage of Port Susan Bay beach frontage, the tidal and fishery characteristics of Port Susan Bay and the possible adverse effects of oil spillage and the dumpage of effluent into the bay.

Following the hearing and on January 9, 1968, the planning commission announced its decision to grant Atlantic Richfield's application to amend the comprehensive plan, and on January 15, 1968, forwarded its findings of fact and recommendation to the Board of County Commissioners of Snohomish County. The board in turn, on February 5, 1968, by resolution adopted the findings and recommendation of the planning commission and amended the comprehensive plan accordingly.

Thereafter and on February 29th and March 1, 1968, pursuant to a petition to rezone the proposed refinery site filed by Atlantic Richfield on the first day of the planning commission hearings on the comprehensive plan amendment, November 30, 1967, the planning commission conducted a public hearing on the petition to rezone. Again, plaintiffs, as opponents, and Atlantic Richfield, as proponent, were represented by counsel and presented, with some additions and refinements, essentially the same testimony and evidence as at the previous hearing, subject to the same limitation as to cross-examination. And, again, the Snohomish County Planning Department recommended against the granting of the petition.

On May 16, 1968, the planning commission rendered its decision granting Atlantic Richfield's petition, as amended at the hearing, to rezone 635 acres of its property from the Rural Use designation to a heavy industrial classification, contingent upon the acceptance and continued validity of a concomitant agreement between the county and Atlantic Richfield concerning the exclusive use and the environmental control of the site for refinery purposes, and upon the rezoning of 245 acres around the perimeter of the site to a forest and recreational use as a buffer zone. The planning commission's findings of fact and recommendations were forwarded to the board of county commissioners on May 27, 1968, and on June 10, 1968, based upon the execu-

tion and "specific enforceability" of the concomitant agreement, the board adopted the recommendation of the planning commission and rezoned the property as indicated.

On June 24, 1968, plaintiffs initiated this action seeking judicial review, by way of certiorari, of the comprehensive plan amendment and rezone proceedings. In essence plaintiffs contended that a change of conditions in the area involved which would warrant the action taken had not been established, that the plan amendment and rezoning determinations amounted to spot zoning and were arbitrary and unreasonable, and that they had been denied due process of law before the planning commission and the board of county commissioners.

The superior court, in voiding the comprehensive plan amendment and rezoning, determined that plaintiffs had not been accorded due process of law in the proceedings before the planning commission and the board of county commissioners and, further, that the rezoning constituted spot zoning. These determinations were predicated upon this court's decision in *Smith v. Skagit County,* 75 Wn.2d 715, 453 P.2d 832 (1969). On appeal, defendants challenge the applicability of *Smith* to the facts of this case.

However, before reaching the substantive issues concerning the zoning process, it is necessary to dispose of a procedural matter interjected by defendants. At the hearing before the superior court, defendants moved to dismiss the writ of certiorari issued upon plaintiffs' petition for review insofar as it pertained to the proceedings relating to the amendment of the comprehensive plan. This motion was denied. In assigning error to this action by the superior court, defendants contend that the proceedings to amend the comprehensive plan are distinct and separate proceedings under the provisions of RCW 36.70,[1] and plaintiffs' failure to seek a timely, separate and intervening review of the amendment proceedings finalizes those proceedings and forecloses a challenge thereto following the subsequent

---

[1] In carrying on its zoning procedures Snohomish County has, by appropriate action, elected to come under the provisions of RCW 36.70 rather than RCW 35.63.

rezoning proceedings. In furtherance of this argument, defendants point to ROA I-57(e)(1), fixing a 15-day time limit for petitions for extraordinary writs seeking appellate review of judicial proceedings, and RCW 36.32.330, imposing a 20-day time limit for appeals from decisions of a board of county commissioners, and, while conceding the cited rule and statute do not apply to superior court review of zoning proceedings, contend that the time limits expressed therein provide a yardstick for applying the doctrine of laches.

█    Although RCW 36.70, by its provisions with respect to the adoption or amendment of a comprehensive plan (RCW 36.70.320-.450) and the adoption or amendment of official zoning controls (RCW 36.70.550-.650, and .800) would appear to contemplate separate proceedings with respect to the comprehensive plan and the implementing zoning controls, we believe the purport and intent of the statute in this regard is directed primarily to the initiatory stages of planning and zoning and to situations where an amendment to an adopted zoning control (rezoning) is not necessarily dependent upon the amendment of an established comprehensive plan. There is no provision in the statute which compels separate proceedings where an amendment to an existing comprehensive plan and an implementing rezoning are interdependent, and there is no provision which prohibits a combination of the two proceedings.

In the instant case, commencing with Atlantic Richfield's public announcement in mid-1967 of its oil refinery proposal, its application in September for a comprehensive plan amendment, and its petition for rezoning on November 30th, the day the hearing on the comprehensive plan amendment commenced, the aim and the ultimate goal was the rezoning ordinance.

The property involved was the same in both proceedings. The evidence presented at both hearings before the planning commission was practically identical, as were many of the issues, factors and contentions involved. The two proceedings were thus evidentially and factually, as well

as property-wise, interwoven, and by their very interdependence were generically bound together, for the rezoning could not proceed without the plan amendment. Once the determination had been reached to amend the comprehensive plan it would have been impractical and improvident not to take the next step and give consideration to Atlantic Richfield's pending petition for the implementing rezone. And, as a matter of fact, the rezone proceeding did closely follow the plan amendment proceeding, for the planning commission gave notice and convened its public hearing on the petition for rezoning 24 days after the county commissioners acted upon the plan amendment.

■ Under these circumstances it would be unreasonable and a piecemeal, duplicative approach to require that plaintiffs seek judicial review of the comprehensive plan amendment proceedings, and, if unsuccessful, be thereafter entitled to again seek judicial review of the subsequent rezone proceedings. Neither do we conceive that defendants were unduly prejudiced or damaged by the absence of an intervening judicial review of the plan amendment proceedings, for they too could have been confronted with the added delay and expense implicit in multiple litigation. Absent such prejudice and damage, the doctrine of laches urged by defendants does not here apply. *Pierce v. King County,* 62 Wn.2d 324, 382 P.2d 628 (1963).

We conclude that the superior court did not err in denying defendants' motion to dismiss a portion of the issues raised by the writ of certiorari.

We turn, now, to the defendants' challenge directed to the superior court's determination that plaintiffs had not been accorded due process of law before the planning commission.

The principal circumstances giving rise to the superior court's conclusion in this regard are these:

Sometime prior to the hearings before the planning commission, the chairman of the planning commission and the chairman of the board of county commissioners made a trip to Los Angeles, California, for the purpose of inspecting an Atlantic Richfield refinery there located. Upon

arrival in Los Angeles, they were met by representatives of Atlantic Richfield, including Mr. L. F. Strador, a vice-president of Atlantic Richfield and one of its chief witnesses at the subsequent hearings, who accompanied them on a tour of the refinery site and facilities, provided hotel accommodations and some meals, and attended a big league baseball game with them. The expense of the trip was borne by Atlantic Richfield, although the county sometime later reimbursed Atlantic Richfield for the transportation costs. Following their return, and before the hearings commenced, the chairman of the board of county commissioners publicly announced his support of Atlantic Richfield's proposal to locate a refinery at Kayak Point. When the matter of this trip was raised by counsel for plaintiffs at the hearings, the chairman of the planning commission refused to permit any discussion concerning it. However, his deposition was taken later and entered as an exhibit in these proceedings.

Mr. Lewis A. Bell, a respected and reputable attorney practicing in Everett, was a member of the planning commission. He, during the period in 1950 when Atlantic Richfield was acquiring its property around Kayak Point, on one occasion carried on negotiations with Atlantic Richfield concerning property belonging to one of his clients and on another occasion represented Atlantic Richfield in a lien foreclosure proceeding incident to the acquisition by it of a different piece of property. During the course of these relationships, Mr. Bell became acquainted with Mr. L. F. Strador, which acquaintanceship continued on a social basis and was implemented by several fishing excursions, one of which occurred in the fall of 1967. In the summer of 1967, when Atlantic Richfield announced its proposal to construct an oil refinery on its property, Mr. Strador queried Mr. Bell concerning legal representation for Atlantic Richfield during the procedures for reclassifying the property involved, at which time Mr. Bell informed Mr. Strador he was on the planning commission and recommended the retention of Mr. Joseph Meagher, Atlantic Richfield's present counsel. Mr. Bell thereafter continued as a member of

the planning commission, participated in the comprehensive plan change hearing and in the decision emanating therefrom.

In January, 1968, after the planning commission had delivered its findings and recommendations concerning the comprehensive plan change to the county commissioners but before the county commissioners had rendered their decision with respect thereto, plaintiffs sought a public hearing before the county commissioners concerning the foregoing circumstances but their request was refused.

At about this time, Mr. Bell resigned from the planning commission and Mr. Edward Jones, attorney for the town of Stanwood and a trustee for the Sno-Isl Regional Library District, was appointed to succeed him. Prior to the comprehensive plan change hearing, Mr. Jones had signed an advertisement in the Stanwood newspaper in support of Atlantic Richfield's proposed refinery and during the course of the hearing before the planning commission appeared as a witness favoring the refinery, at which time he emphasized the benefits that would flow to the Stanwood area and the library district if the refinery project was approved. Plaintiffs' objections to Mr. Jones sitting as a member of the planning commission during the subsequent rezone hearings were denied. Mr. Jones, then, sat as a member of the planning commission during the public hearings on the rezoning issue, and participated to some extent in executive sessions of the planning commission, but disqualified himself from taking part in the planning commission's decision and recommendations concerning the proposed rezone.

Based upon the cumulative impact of the foregoing circumstances, the superior court determined that the planning commission's hearings lacked the appearance of fairness required by *Smith v. Skagit County*, 75 Wn.2d 715, 453 P.2d 832 (1969). Thus, the trial court concluded that plaintiffs were deprived of due process of law.

We affirm the determination and conclusion of the superior court.

In so doing, we start with the premise that comprehensive planning and zoning proposes and imposes limi-

tations upon the free and unhampered use of private as well as public property, and when such regulations are once enacted, the indiscriminate amendment, modification or alteration thereof tends to disturb that degree of stability and continuity in the usage of land to which affected landowners are entitled to look in the orderly occupation, enjoyment, and development of their properties. Perforce, by the very nature of our society, the initial imposition of zoning restrictions or the subsequent modification of adopted regulations compels the highest public confidence in the governmental processes bringing about such action. Circumstances or occurrences arising in the course of such processes which, by their appearance, tend to undermine and dissipate confidence in the exercise of the zoning power, however innocent they might otherwise be, must be scrutinized with care and with the view that the evil sought to be remedied lies not only in the elimination of actual bias, prejudice, improper influence or favoritism, but also in the curbing of conditions which, by their very existence, tend to create suspicion, generate misinterpretation, and cast a pall of partiality, impropriety, conflict of interest or prejudgment over the proceedings to which they relate.

RCW 36.70.040 authorizes and establishes the county planning commission such as here involved and denominates it as the tribunal which conducts such planning and zoning hearings as may be required under other provisions of RCW 36.70. RCW 36.70.070 through 36.70.120 provides for the appointment, tenure, and removal of members as well as the organization of the commission. In connection with the adoption of a comprehensive plan, the implementation thereof by regulatory controls, and the subsequent amendment of either the comprehensive plan or the regulations, RCW 36.70.380, .400, .410, .580, and .600 require a public hearing, after notice, before the planning commission and the entry of findings of fact along with recommendations and reasons by the commission before adoptive or amendatory action may be taken by the board of county commissioners. Other provisions relate to procedures for changes or the initiation of changes by the board of county com-

missioners in the recommendations of the planning commission and vest final legislative authority with the board.

■ Whatever descriptive characterization may be otherwise attached to the role or function of the planning commission in zoning procedures, *e.g.*, advisory, recommendatory, investigatory, administrative or legislative, it is manifest under the statutory scheme of RCW 36.70 that it is a public agency, established pursuant to state statute, composed of appointive—as distinguished from elective—public officers, a principal and statutory duty of which is to conduct public hearings in specified planning and zoning matters, enter findings of fact—often on the basis of disputed facts— and make recommendations with reasons assigned thereto. Certainly, in its role as a hearing and fact-finding tribunal, the planning commission's function more nearly than not partakes of the nature of an administrative, quasi-judicial proceeding, implicit in which is the basic due process requirement that the hearing and fact-finding process must be fair and impartial.

Likewise, the members of the planning commission, as public officers impressed with the duty of conducting a fair and impartial fact-finding hearing upon issues significantly affecting individual property rights as well as community interests, must, so far as practicable, consideration being given to the fact that they are not judicial officers, be open minded, objective, impartial and free of entangling influences or the taint thereof. *State ex rel. Beam v. Fulwiler*, 76 Wn.2d 313, 456 P.2d 322 (1969). They must be capable of hearing the weak voices as well as the strong. To permit otherwise would impair the requisite public confidence in the integrity of the planning commission and its hearing procedures.

It is the foregoing considerations that prompted us to state in *Smith v. Skagit County*, 75 Wn.2d 715, 739, 453 P.2d 832 (1969):

> It is axiomatic that, whenever the law requires a hearing of any sort as a condition precedent to the power to proceed, it means a fair hearing, a hearing not only fair in substance, but fair in appearance as well.

In the instant case, we find no evidence of, nor do we impute any, dishonest, dishonorable or self-serving motives or conduct on the part of any members of the planning commission in conducting the hearing and entering their findings of fact and recommendations. Neither do we hold that the respective individual actions, relationships and expressed views of the chairman of the planning commission, Mr. Bell, or Mr. Jones constitute any breach of public trust which, standing alone, would necessarily and fatally infect the hearing and fact-finding proceeding. Nevertheless, we, as was the trial court, are driven to the conclusion that the unfortunate combination of circumstances heretofore outlined and the cumulative impact thereof inescapably cast an aura of improper influence, partiality and prejudgment over the proceedings thereby creating and erecting the appearance of unfairness condemned in *Smith v. Skagit County, supra*.

Furthermore, we are inclined to the view that under the circumstances of this case, the denial by the planning commission of the opportunity of respective counsel for the parties to cross-examine the expert witnesses called and testifying on behalf of the parties at the hearing added to the appearance of unfairness inhering in the proceedings.

■ Generally speaking, in the ordinary zoning or rezoning hearings before a planning commission the cross-examination of persons expressing their views may not be appropriate or contribute anything of value to the fact-finding process. Where, as here, however, the hearing assumes distinctly adversary proportions, the proponents and opponents are represented by counsel, expert witnesses are called, and complex, technical and disputed factors, revolving about such matters as oil refinery processes, air pollution, noise levels, visual impact, water and vegetation contamination, shipping and dockage operations, oil spillage control, tidal currents and fishery preservation, are involved, it would appear particularly pertinent to an objective factual evaluation of the testimony presented to permit cross-examination in a reasonable degree. Otherwise, it is possible that matters of vital significance to the fact-finding

tribunal may be glossed over, obscured or omitted in a recital-like presentation of technical subjects and expert opinion.

On this phase of the case we conclude, as we did in *Smith v. Skagit County, supra,* by stating, at page 743:

In this case, the hearings called for by the statute as an essential precondition to the enacting of zoning changes were so wanting in apparent fairness as to vitiate the legislation emerging from them.

The superior court, in addition to its determination that the public hearings involved lacked the appearance of fairness, also concluded that the rezoning of the proposed refinery site to a heavy industrial classification and the limitation thereof to the exclusive use of Atlantic Richfield for refinery purposes amounted to spot zoning as that concept is defined in *Smith v. Skagit County, supra.*

Again, we agree with the trial court.

The portion of the Stanwood Planning Area principally affected by the rezoning appears on the maps introduced to be an area embracing Lakes Martha and Howard on the north, Lakes Goodwin and Ki to the east, Lakes Crabapple and Shoecraft to the south, and the shore of Port Susan Bay to the west. This affected area is composed of at least 12 sections of land, or approximately 7,680 acres. From this acreage the rezone proposed to carve out 635 acres, zone it heavy industry, and devote it, by concomitant agreement, exclusively to an oil refinery site to be operated by Atlantic Richfield, and this, despite the Snohomish County Planning Department's study which indicated that changing conditions in other parts of Snohomish County primarily marked the area involved as a prime residential and recreational district, consistent with the original comprehensive plan and land use classification. The principal change of conditions in the actual area affected, upon which the rezoning action was predicated, was Atlantic Richfield's proposal to build an oil refinery upon its property. Among the primary factors weighed in consideration of the general welfare, public health and safety as related to the proposed project was the potential tax revenue it would produce for the county,

and Atlantic Richfield's refusal to consider any other site in Snohomish County.

These circumstances prompted the Snohomish County Planning Department to state in its study and recommendation concerning the proposed rezone:

The Atlantic-Richfield Company is an outstanding example of a large company with an established record of community responsibility. We fully recognize and appreciate their sincere attempt to utilize their property in a manner that will be an asset to the community. Yet the fact remains that the refinery site is in the wrong place. It violates just about every accepted principal regarding the appropriate location of heavy industry. It would be located in the midst of an outstanding residential area without adequate road or rail access and could possibly have a detrimental effect on water and land resources.

Perhaps most importantly, it would establish an industrial land use precedent which would eventually eliminate Port Susan Bay and the Stilliguamish River delta as invaluable recreational resources for all our citizens. . . . The alternative of granting only this one site the right to develop industrially while denying this right to other similarly circumstanced land in the area, cannot be seriously considered because of the obvious lack of equity involved in giving special consideration, or as it is commonly termed, spot zoning.

■ We agree with the planning department's remarks, and would point out that in a somewhat analogous situation, we stated in *Smith v. Skagit County, supra,* at 743:

Spot zoning is a zoning for private gain designed to favor or benefit a particular individual or group and not the welfare of the community as a whole. *See* C. Rhyne, *Municipal Law* § 32-3, at 825 (1957). The vice of a spot zone is its inevitable effect of granting a discriminatory benefit to one or a group of owners and to the detriment of their neighbors or the community without adequate public advantage or justification. *Thomas v. Town of Bedford,* 11 N.Y.2d 428, 184 N.E.2d 285 (1962). Zoning merely for the benefit of one or a few, or for the disadvantage of some and with no substantial relationship to the public health, safety, general welfare or morals, in conflict with either the comprehensive zoning plan or ordinance is arbitrary and capricious and unlawful.

*Eckes v. Board of Zoning Appeals of Baltimore Cy.*, 209 Md. 432, 121 A.2d 249 (1956).

The superior court did not err in concluding that the rezoning procedures amounted to spot zoning.

In view or our disposition of the principal issues in the case, we do not find it necessary to reach the additional contentions of the parties.

The judgment of the superior court is affirmed.

FINLEY, ROSELLINI, HALE, McGOVERN, and STAFFORD, JJ., concur.

FINLEY, J. (concurring)—The majority's resolution of this case is based upon two propositions: first, the requirement of "fairness in appearance" (or lack thereof) established by *Smith v. Skagit County*, 75 Wn.2d 715, 453 P.2d 832 (1969); and, additionally, upon the determination that the county zoning ordinance disputed herein amounted to spot zoning. I agree with the majority's disposition of this appeal upon the aforementioned bases, and I have signed the majority opinion.

I am in particular agreement with the comments of the majority opinion at pages 893-94 regarding the appearance of fairness doctrine. However, some additional brief comment on the appearance of fairness doctrine or standard seems to me appropriate. Rationally evaluated, this standard of legislative conduct is, perhaps, more aligned with subjective, rather than objective analysis and evaluation. Nevertheless, in my opinion, there is much to be said for the application of what could possibly be termed a "subjective" standard in the judicial review of zoning actions by local legislative bodies.

Unquestionably, today's modern zoning has become a fact of modern life. In earlier, perhaps more pastoral or rural times, the concepts of public nuisance or common law nuisance were probably the most likely—yet limited—legal theories available or adaptable for land-use planning. But, later day concepts of modern zoning mandated by modern necessities have undergone a rapid and expansive develop-

mental process in order to supplement or overcome the inadequacies of common law theory.

The increase in population, its growing concentration or urbanization, and an infinite variety of modern land uses have precipitated an insistent social need for modern and effective land-use planning, *i.e.*, zoning. Modern zoning, therefore, has become a vitally important consideration relative to the ownership and use of land and probably will become increasingly so. Inherent in this is, of course, the importance of the sensitive nature of individual rights involved in decisions affecting the use and enjoyment of land.

Considering this broad frame of reference and the broad impact of zoning on the lives of such a large percentage of our population—urban and suburban, as well as rural— the *appearance of fairness* relative to zoning becomes of paramount importance. In my judgment, no less than the highest standards of due process must be demanded of local legislative bodies in the formulation and the implementation of zoning determinations. In making such determination, in other words, justice not only must be done; justice must be seen to be done.

For these reasons I concur in the majority's resolution of this case and its adherence to the appearance of fairness standard announced in *Smith v. Skagit County, supra.*

NEILL, J. (dissenting)—On the basis of statements in *Smith v. Skagit County,* 75 Wn.2d 715, 453 P.2d 832 (1969), the trial court and a majority of this court have overridden findings and conclusions of the duly elected and appointed officials vested with the responsibility for control of land use in Snohomish County. In so doing, today's majority has employed inconclusive precedent[2] to overthrow a local planning decision, reached after some 7 months of special hearings and deliberations, which accorded with the expectations of the original county comprehensive zoning plan.

[2]The opinion in *Smith v. Skagit County,* 75 Wn.2d 715, 453 P.2d 832 (1969), was signed by three members of the court; two justices concurred in the result only; and four dissented from both result and reasoning.

I continue my concurrence in Justice Hill's dissent to *Smith v. Skagit County, supra,* at 746-58. I further disagree with the application of the *Smith* rationale to the facts of the present case.

My disagreement is based on both the law and the facts of this case. I can summarize my points of difference as follows: (1) Reliance on unfounded appearances is not a proper basis of judicial decision. (2) The proceedings were not unfair under either the Smith test or the rules more recently set forth by this court. (3) The majority has failed to take account of the concomitant agreement. (4) The amendment to the zoning ordinance does not constitute "spot zoning."

### (1) Reliance on Unfounded Appearances Is Not a Proper Basis of Judicial Decision

I do not gainsay the general focus that the majority has taken. If there is any aspect of the highly charged and obfuscated subject of "zoning" that is capable of effective judicial action, it is in the area of the traditionally legal questions of due process. It is far better that our attention center on such traditional legal issues than that we embroil ourselves, as some kind of super-zoning commission, in those policy and administrative determinations for which we are not equipped.

My objection is not to the general requirement of, and judicial concentration on, the fairness of the proceedings, but to the emphasis on appearances. At a time when substantive legal considerations bearing upon land use control are in tumultuous development, such emphasis seems to evade, rather than cope with, difficult issues fairly raised. Moreover, the very nature of the subject renders such emphasis questionable. It requires no legal expertise to know that appearances are often misleading, a danger that is severely aggravated by modern techniques of image-making. There is the further hazard that elevation of "appearance of unfairness" to the status of a legal term of art may come to serve as a cloak for unexplained, ephemeral grounds of decision. For these reasons I believe that emphasis on appearances is a veiled and dangerous practice.

Even if I were to accept the emphasis on appearances contained in *Smith,* I would not be in accord with the majority's result. It would be valid and, I submit, less dubious to read *Smith* as stating that suspicious circumstances yielding a definite appearance of unfairness can be sufficient to counterbalance the usual presumption of due and proper zoning enactments and place a burden on the zoning agency to show that the proceedings were fair in fact.[3] I find nothing in *Smith* which stands for the proposition that a zoning decision will be nullified wherever there are circumstances which could *tend* to give the proceedings an appearance of unfairness, even though the realities are admittedly otherwise. In adopting that proposition, today's majority does not apply *Smith* so much as it expands on that case to hold that vague tendencies toward unsupported appearances are not merely worthy of emphasis—they are dispositive. With that, the court has premised judicial decision entirely on matters having no more reality than the shadows in Plato's cave.

As applied here, the "appearance approach" inserts another totally subjective standard into the body of law. The basic premise, if there be a valid one, for making good appearances mandatory, is the need for public confidence in government procedures. The appearance of fairness is in the eyes of the beholder. Here, there is no evidence in the record that these proceedings appeared unfair to the public as distinguished from the contestants themselves. The only assertion in this regard is respondent's statement

---

[3]*See* Note, 5 Gonzaga L. Rev. 324, 329 (1970), where a commentator on the *Smith* case observes:

Apart from any positive features, the "appearance approach" most assuredly has certain inherent weaknesses. Built upon a foundation of general terminology, and keyed to superficial, external impressions, it is questionable whether the approach has any merit at all as a means of determining or safeguarding the fairness of hearings. Clearly, an over-emphasis and dependence on appearances will very likely result in fostering the very evil the court seeks to destroy. On the other hand, when combined with equal proportions of emphasis on "substance," the appearance approach could prove a valuable tool and a helpful aid in upholding fairness.

(*Smith v. Skagit County,* 75 Wn.2d 715, 453 P.2d 832 (1969).)

that "[C]ertainly the people who oppose this rezone feel they did not get a fair hearing." Such is perhaps the very human reaction of many, if not most, unsuccessful contestants in the history of adjudication. Absent any evidence of public impact, the "appearances" can only be gleaned from each judge's personal interpretation of how things would look to the public if all members of the public thought as he did. That is a subjective and personal, not a legal, standard.

(2) THE PROCEEDINGS WERE NOT UNFAIR UNDER EITHER THE
SMITH TEST OR THE RULES MORE RECENTLY SET
FORTH BY THIS COURT

The picture created by the majority's summary of the facts does not depict the entire scene. For the sake of completeness, it is necessary to observe:

The notion that Atlantic Richfield might locate a refinery in the Stanwood area did not arise suddenly in mid-1967. This very possibility had been contemplated for some 10 years in the planning of various local governing groups, such as the school and fire protection districts. The original comprehensive plan of 1964 did not permanently set aside the Kayak Point area—the site here in issue—for residential development. Quite the opposite. The comprehensive plan expressly anticipated, and provided for the possibility, that Richfield would decide to establish a refinery at this site, in the following language:

> It would be of every advantage to the town of Stanwood and the surrounding area to attempt to develop and attract industry to this location as soon as possible. Although Stanwood and the entire northern portion of the planning area will have fairly easy access to the employment centers of Everett and King County upon the completion of the new freeway, the distance to these centers will always be considerable. The present industry located at Stanwood is to a large extent seasonal in nature and is inadequate to attract and support the population which should develop in the surrounding areas.
>
> Although the attraction of industry to Stanwood is essential to its growth, it is recommended that an attempt be made to be discriminatory as to what type of industry

is attracted. Because of the proximity of the residential and business areas, it is recommended that the industry attracted be clean and as compatible as possible with the surrounding uses.

It should be noted at this time that Figure 2 in the Appendix does not indicate the Richfield owned land at Kayak Point as a future industrial site. It is the opinion of the staff that this land would be very inadequate for most types of industry *other than a refinery*.

The site itself is fairly small and is bordered on the east by a fairly steep topographic break. Access to the site would be only by trucks or by boat. Access for trucks is not the most desirable since Marine Drive (Stanwood-Warm Beach Road) is fairly crooked, contains some fairly steep grades, and passes through many areas which are essentially residential in character before it reaches Highway 99.

*If and when Richfield decides to establish a refinery here the comprehensive plan will have to be amended to show this industrial area. Until that time* the entire site should be designated as residential since it is felt that this use would be the best for the area from the standpoint of compatibility and practicability.

(Italics mine.)

Thus, the original comprehensive plan favorably anticipated amendment when and if Richfield decided to locate a refinery on this property. These provisions of the original comprehensive plan antedated the acquisition of land in the area by many current owners and any inquiry or investigation would have revealed that a refinery might be located on Kayak Point.

The anticipated use of this site for a refinery was also reflected in the zoning classification given this area under the 1964 (original) comprehensive plan. The area in question was zoned "rural use" rather than "residential." That classification is not questioned here. In Snohomish County, the primary actual usage of property zoned "rural use" is agricultural, recreational and residential. However, the zoning classification does not *limit* "rural use" property to these uses. The relevant provision of the Snohomish County Code (18.64.010) states:

The purpose and function of the Rural Use Zone is to allow the minimum of controls in those portions of the county which are largely rural in character without detrimentally affecting the public health, safety, and general welfare and without adversely affecting the general objective and policies of the comprehensive plan. It is anticipated that as an area loses its rural character that the zoning of such area shall change to one of the other zones provided for in this Ordinance.

Thus, the express terms of both the comprehensive plan and the particular zoning classification of this property called for change, rather than permanence.

This is not a dispute between an industry bent on atmospheric, aquatic and esthetic pollution on the one hand and the citizens of the community on the other hand. Rather, the local governing authorities were faced with honest and sincere differences of opinion among local property owners and residents. Parties opposing amendment and rezone are largely summer residents and recreational users, while those favoring change are principally local community citizens and their representatives who had long anticipated a refinery located at this site. Among the latter are the majority of those living in the nearby Lake Goodwin area, the superintendent of the Stanwood schools, the Mayor of Stanwood and the editor of the Stanwood News. The issue, from the proponent's viewpoint, was indicated by Mr. Danielson, the editor of the local Stanwood News.

It seems to me that the essence of what is to be done here is to decide whether or not the Stanwood area is to be relegated to the status of a bedroom community, a community bereft of a payroll and the tax benefits that come with the location of a multimillion dollar industry within its borders. It is true that some of the area immediately surrounding Stanwood has been zoned as industry, but in practice, in a practical sense this same area along with the entire Stillaguamish Valley floor was zoned for agriculture through the defeat last year of a proposed flood control restriction. This means that no federal money can now be used in the development of this area and, obviously, few industries are going to settle in a locality subject to periodic flooding, so if in-

dustry is to come in the near future to our area, it must settle somewhere else in our district.[4]

Now, for the last ten years, ever since Richfield bought its present site, we thought we had this problem licked in some measure. All of us took it for granted that the refinery development would be only a matter of time in coming. As a matter of fact, as editor of the local newspaper, I never heard one word of adverse comment about the proposed new industry until just two or three months ago. Even when the Snohomish County Planning Commission held a public hearing in our town on the proposed comprehensive plan for the Stanwood area in March 1965, it was understood that the zoning of the Richfield site could be changed to industrial use whenever Richfield decided the time had come to develop a refinery.

With the exception of waterfront properties, this area has not experienced significant residential development. The land for a mile or more around the Richfield property is essentially vacant wilderness. The site in question is quite hilly, and the testimony was that the refinery would not be visible from residences on the beach. Opponents objected at the hearings to a lack of written controls of pollution and noise, and they called for contract covenant obligations on Richfield's part, excluding other industries from the site and creating a land buffer between Richfield's site and the other property in the area. In the end, each of these objections and demands were met by reclassifying 200 of Richfield's acres as a buffer zone and by conditioning the rezone on a concomitant agreement.

It thus appears that the officials charged with the responsibility of legislating and administering the zoning regulations were not engaging in a thoughtless nullification of a comprehensive plan contrary to the wishes and justifiable expectations of the citizenry in order to accommodate the unfettered whims of a polluting industrial giant. Rather,

---

[4] The only alternative location suggested during these proceedings was a "Tract Q" suggested by the planning department. "Tract Q" consists of tidelands presently under water—it does not exist. There are no plans to fill and develop this area in the foreseeable future. In fact, under a current decision of this court, such filling and development may be prohibited. *See Wilbour v. Gallagher*, 77 Wn.2d 306, 462 P.2d 232 (1969).

the facts are that (1) the original comprehensive plan expressly provides for its own amendment in precisely this contingency; (2) various local agencies had, for some 10 years, counted on this development in their planning; (3) area landowners were, by the clear terms of the original comprehensive plan, on notice of the expected amendment and probable location of a refinery at this precise site; (4) the amendatory proceedings were in accord with all statutory requirements with proponents and opponents alike speaking their minds as to the desirability of this change; and (5) all substantive complaints of the opponents were alleviated by the final amendatory arrangements.

A further word need be said regarding the three planning commission members whose interest, bias and qualifications are alluded to in the majority opinion.

Mr. Weber, the planning commission chairman, did accompany the chairman of the board of county commissioners to California, where they inspected an operational Atlantic Richfield refinery. The travel costs of this trip were paid by the county on October 9, nearly 2 months before the first of these hearings and before the opponents made any issue of this matter. There is neither evidence nor assertion that Mr. Weber stood to reap any personal gain or loss, pecuniary or otherwise, from the outcome of these proceedings. Mr. Weber made no public announcement upon his return of any support for or opposition to the Richfield proposal; the statement by the chairman of the board of county commissioners cannot be transferred to Mr. Weber. The first indication in the record of Mr. Weber's conclusion as to the Richfield proposal, is that shown by his recorded vote after the hearings were completed. The record gives ample reason to believe that the opponents knew of this trip well in advance of the comprehensive plan hearings of November 29th and December 1st. Nevertheless, the matter of this trip was not mentioned until counsel for the opponents injected the matter after the close of his presentation, at the end of the last day of the hearings.

Mr. Bell, the sole attorney member of the planning commission at the comprehensive plan hearings, had not dealt

with Atlantic Richfield for over 10 years. There is neither evidence nor suggestion that Mr. Bell had any pecuniary or other personal interest in the outcome, except that which he held in common with other citizens of the community. A mere social acquaintanceship of over 10 years' duration was not sufficient ground to compel his disqualification. *See Bishop v. Houghton*, 69 Wn.2d 786, 420 P.2d 368 (1966). Again, no objection was voiced by the opponents during the course of the hearings. The matter was first raised by the opponents in a letter of January 26th, 11 days after the planning commission had made its findings and recommendations to the board of county commissioners. Mr. Bell then resigned and took no further part in these proceedings.

Mr. Jones, who replaced Mr. Bell as the only attorney member of the planning commission, was challenged at the beginning of the rezoning hearings on the basis of his previous expressions of support for the Atlantic Richfield proposal. Again, there is neither evidence nor assertion that Mr. Jones had any personal stake in the outcome. As the sole attorney member, Mr. Jones provided legal assistance in the conduct of the hearings and some executive sessions. When matters reached the decisional stage, Mr. Jones disqualified himself.

The complete facts of this case do not present an unfair proceeding, even under the Smith test. In *Smith*, the majority opinion states:

> The test of fairness, we think, in public hearings conducted by law on matters of public interest, vague though it may be, is whether a fair-minded person in attendance at all of the meetings on a given issue, could, at the conclusion thereof, in good conscience say that everyone had been heard who, in all fairness, should have been heard and that the legislative body required by law to hold the hearings gave reasonable faith and credit to all matters presented, according to the weight and force they were in reason entitled to receive.

75 Wn.2d at 741.

The conclusion in *Smith* that this test was not satisfied was based on either (1) the uncontradicted fact that the board of county commissioners had accepted the planning

commission's recommendation without independent consideration or, (2) the idea that, though hearings are not required at the board level by RCW 36.70, any hearings actually held must comport with the requirements for planning commission hearings. Neither of these bases applies here. As to the first, the record shows without contradiction that the board made its own, independent conclusions. As to the second, no public hearings are required and none were promised or held by the board of county commissioners. Thus, the board's actions here were free of the faults found to exist in *Smith*.

As to fairness, it is clear that, at the various meetings on the issues of amendment and rezoning, "everyone had been heard who, in all fairness, should have been heard." *Also see Nelson v. Seattle*, 64 Wn.2d 862, 395 P.2d 82 (1964). There was a 2-day hearing on the amendment to the comprehensive plan on November 30th and December 1st, at which all viewpoints were presented as to the proposed amendment to the comprehensive plan. Another 2-day hearing on the rezoning was held on February 29th and March 1st, at which similar information and testimony was received. Neither the record nor the majority gives any hint whatsoever that any substantive viewpoints were excluded.

The opponents complain that they were not permitted to cross-examine the witnesses who favored the proposition. The complaint is not supported by the record. During these hearings, each side was allowed to and did question the other's witnesses. Although the procedure was not identical to courtroom cross-examination, there is no such requirement even in today's majority decision. Further, the realities of the situation would not have permitted a greater degree of cross-examination than that permitted here. As it was, the hearings each lasted 2 full days. As the planning commission chairman noted at the outset, to allow formal cross-examination would have unduly prolonged the hearings. It is very doubtful that whatever added benefit was to be gained by formal cross-examination (as opposed to the informal, but direct questioning that was allowed) would have been more productive of fact. Thus, the sub-

stance of the respondents' contention does not rise to an abuse of discretion or constitute such arbitrary and capricious actions as to justify judicial rebuke.

As the majority also observes, there is in this case neither evidence nor imputation of any dishonorable motive or conduct on the part of anyone who took part in these deliberations. Even under the terminology of *Smith*, "the legislative body required by law to hold hearings gave reasonable faith and credit to all matters presented, according to the weight and force they were entitled to receive." The realities of this case do not demonstrate unfairness.

Subsequent to the decision in *Smith*, this court, in *Chestnut Hill Co. v. Snohomish*, 76 Wn.2d 741, 458 P.2d 891 (1969), was presented with the situation where an avowed opponent of a proposed zoning ordinance was appointed to the city planning commission. Attempts to have him disqualify himself or be disqualified were to no avail. On appeal, appellants argued that his participation denied them a fair hearing. This argument was rejected on the grounds that planning commission recommendations are not binding on the city council (which makes the final decision) and that the opponent was not a member of the city council and had no right to participate in its deliberations or cast a vote in its determination. (76 Wn.2d at 748, 749.)

In the present case, the county zoning responsibilities are identically allocated by RCW 36.70.650:

> The report and recommendation by the planning agency, whether on a proposed control initiated by it, whether on a matter referred back to it by the board for further report, or whether on a matter initiated by the board, shall be advisory only and the final determination shall rest with the board.

We are dealing here, not with planning commission recommendations, but with a comprehensive plan amendment and a rezoning ordinance—the ultimate results of legislative determinations by the board of county commissioners. The distinction, it seems to me, is significant. Whatever be the characterization of the planning commission hearings, any insufficiency there should not vitiate the commissioners'

legislative decision, at least absent a showing that the board's conclusions were not independently reached. Here, the board entered a specific and unquestioned finding that its conclusions were independent of the planning commission recommendations. In these circumstances, the application of *Chestnut Hill Co. v. Snohomish, supra,* to this case is supported on identical statutory grounds and by unchallenged fact.

In *Chestnut Hill Co. v. Snohomish, supra,* we also reiterated several well established rules pertaining to judicial review of zoning decisions, at page 746:

> In *State ex rel. Myhre v. Spokane,* 70 Wn.2d 207, 210, 422 P.2d 790 (1967), we explained that
>
> [z]oning is a discretionary exercise of police power by a legislative authority. *Lillions v. Gibbs,* 47 Wn.2d 629, 289 P.2d 203 (1955). Courts will not review, except for manifest abuse, the exercise of legislative discretion. *State ex rel. Smilanich v. McCollum,* 62 Wn.2d 602, 384 P.2d 358 (1963). Manifest abuse of discretion involves arbitrary and capricious conduct. Such conduct is defined to be without consideration and in disregard of the facts. *State ex rel. Lopez-Pacheco v. Jones,* 66 Wn.2d 199, 401 P.2d 841 (1965); *State ex rel. Cosmopolis Consol. School Dist. No. 99 v. Bruno,* 61 Wn.2d 461, 378 P.2d 691 (1963). One who asserts that a public authority has abused its discretion and is guilty of arbitrary, capricious, and unreasoning conduct has the burden of proof. *State ex rel. Lopez-Pacheco v. Jones, supra; State ex rel. Longview Fire Fighters Union, Local 828 v. Longview,* 65 Wn.2d 568, 399 P.2d 1 (1965). If the validity of the legislative authority's classification for zoning purposes is fairly debatable, it will be sustained. *Euclid v. Ambler Realty Co.,* 272 U.S. 365, 71 L. Ed. 303, 47 Sup. Ct. 114, 54 A.L.R. 1016 (1926).

Further, those who attack the actions of a local legislative body must overcome a presumption of proper and regular conduct. *Chestnut Hill Co. v. Snohomish, supra; Bishop v. Houghton, supra.*

The board's decisions, and the resulting amendment and rezone, were the products of legislative discretion. *Chestnut Hill Co. v. Snohomish, supra; Lillions v. Gibbs,* 47 Wn.2d 629, 289 P.2d 203 (1955). *See also, Lund v. Tumwater,* 2

Wn. App. 750, 472 P.2d 550 (1970), petition for review denied, October 26, 1970.[5] As such, under our established rules, these actions are not subject to judicial veto unless manifestly unreasonable, arbitrary and capricious. Courts will uphold such actions so long as their propriety is at least "fairly debatable." *E.g., Farrell v. Seattle*, 75 Wn.2d 540, 452 P.2d 965 (1969); *Carlson v. Bellevue*, 73 Wn.2d 41, 435 P.2d 957 (1968); *McNaughton v. Boeing*, 68 Wn.2d 659, 414 P.2d 778 (1966); *Bishop v. Houghton*, 69 Wn.2d 786, 420 P.2d 368 (1966); *State ex rel. Smilanich v. McCollum*, 62 Wn.2d 602, 384 P.2d 358 (1963).

When all facts and circumstances of this case are considered, the decisions of the board are at least fairly debatable and should be upheld. The economic benefit to be derived from decision of industry to locate at this site did not stand alone as the factor justifying change.[6] Additional factors include the specific anticipation of this very amendment in the original comprehensive plan, the reliance for some 10 years by local agencies upon this precise development, and the existence of a concomitant agreement which

---

[5] No significance should be attached to this court's denial of a petition for review of a decision of the Court of Appeals, since the decision whether or not to review a particular case derives from considerations other than our opinion of the merits. *See* CAROA 50(b)(3).

[6] Even if industrial willingness were the sole affirmative factor, that should not automatically render a legislative rezoning decision arbitrary and capricious. Realities suggest the need for a judicious distinction between those cases in which the new industry would merely add to an existing economic base and those in which the new industry would provide a solid economic base for the community where none existed before. In the latter instance, the prospective addition is seen to contain a much stronger relationship to the general welfare of the community.

It bears recognition that the term "community" is now in a state of flux, with concepts of "regional" planning in debate with those of "local" or "neighborhood" autonomy. It would not be appropriate for this court to inject itself into that debate, which is so clearly legislative and political in nature. In the present case, respondents make no attempt to expand the definition of "community" beyond the bounds of Snohomish County. In that context, the fact is that the Richfield facility would provide a previously nonexistent economic base and prevent the area from becoming a "bedroom community." In these circumstances, even if Richfield's willingness to locate were the only favorable factor, that should not render the attendant zoning changes void per se.

satisfied the substantive objections of the opponents. Both sides were heard. *See Nelson v. Seattle,* 64 Wn.2d 862, 395 P.2d 82 (1964).

The realities of this case do not support judicial nullification of these zoning amendments on grounds of unfairness, either under the Smith test or under the rules more recently stated in *Chestnut Hill Co. v. Snohomish, supra.* To the contrary, adherence to our established rules of judicial review requires affirmance of these actions. The facts simply do not support the "appearances" alluded to by the majority.

(3) The Concomitant Agreement

In the preceding pages I have referred to the existence in this case of a concomitant agreement. A discussion of the agreement is appropriate as questions of the validity and effect of such agreements, fairly raised and ably argued by these parties, present significant issues in this case.

In previous cases we have, to some extent, clarified the legality of concomitant agreements. In *Besselman v. Moses Lake,* 46 Wn.2d 279, 280 P.2d 689 (1955), the municipality refused to rezone three of plaintiff's lots from residential to industrial use unless he provided it with a drainage ditch across one of the lots. The precise issue before us was whether a property owner can compel rezoning by mandamus, a question which we answered in negative. Incidental to that decision, we stated at page 280:

> There can, however, be no question but that the trial court was correct in its statement that, in demanding such a consideration for the rezoning, the position of the city was "arbitrary, coercive, and *ultra vires,*" but no official action of the city is before us for review. This is not the case of a rezoning ordinance with a condition attached thereto which could be attacked as unlawful or *ultra vires,* . . .

The above language was taken by some as indicating that this court would find invalid *any* rezoning ordinance with a condition attached. That notion was dispelled in the case of *State ex rel. Myhre v. Spokane,* 70 Wn.2d 207, 422 P.2d 790 (1967). We stated at page 216:

> There are jurisdictions which hold that all zoning ordinances which are amended, with concomitant agreements,

are invalid. We hold the better rule to be that, before deciding to amend a zoning ordinance, the city must weigh the benefits which will flow to the public generally against the detriment, if any, to the adjacent property owners or to the public which may result therefrom. An amendment to a zoning ordinance and a concomitant agreement should be declared invalid only if it can be shown that there was no valid reason for a change and that they are clearly arbitrary and unreasonable, and have no substantial relation to the public health, safety, morals, and general welfare, or if the city is using the concomitant agreement for bargaining and sale to the highest bidder or solely for the benefit of private speculators.

The circumstances in *Myhre* were somewhat different from those present in *Besselman.*[7] In *Besselman*, the city argued that the property owner had created a drainage problem in filling his lots. The problem was then existent, and unrelated to any conditions that would arise from the anticipated use of the property after rezoning. In that stance, the city's attempt to obtain, in effect, a drainage easement was beyond the limits of its zoning power and was instead, as we noted, more properly a matter of eminent domain.

In *Myhre*, all contract obligations of the property owner were exclusively related to mitigation of public needs which were expected to arise from the use of the property if rezoned. Fulfillment of those needs was a matter within the city's proper authority. The city was not bound by the agreement to exercise its zoning power in any way. Under these circumstances, we said

When the city requires that the cost of such safety measures be borne by the company, it is not bargaining away its regulatory police power but, rather, determining that the cost should be borne by the persons who created the necessity for the expenditure of such funds, instead of by the city generally. Such a determination is within the city's legislative authority. It follows that a written concomitant agreement resulting therefrom is not ultra vires.

70 Wn.2d 216.

---

[7] A useful discussion of the *Myhre* and *Besselman* cases is provided in *Comment, Zoning and Concomitant Agreements*, 3 Gonzaga L. Rev. 197 (1968).

Synthesized, these cases express our recognition that concomitant agreements may be valid appendages to the exercise of zoning power. The indicia of validity in such agreements include: (1) The performance called for is directly related to public needs which may be expected to result from the proposed usage of the property to be rezoned. (2) Fulfillment of those needs is an appropriate function of the contracting governmental body. (3) Performance will mitigate the public burden in meeting those resulting needs by placing it more directly on the party whose property use will give rise to them. (4) The agreement involves no purported relinquishment by the governing body of its discretionary zoning power.

Basically, a valid concomitant agreement operates to neutralize any expected negative impact of the proposed property usage. In this, it is distinguished from an agreement which seeks to extract some collateral benefit from the property owner. Such latter agreements are void attempts to sell or bargain legislation. *State ex rel. Myhre v. Spokane, supra; Puget Sound Alumni of Kappa Sigma, Inc. v. Seattle*, 70 Wn.2d 222, 422 P.2d 799 (1967).

Valid concomitant agreements reflect a dual nexus, first, between the performance called for and the fulfillment of an anticipated public need and, second, a causal connection between the particular need or needs to be fulfilled and the proposed usage of the property in question. As such, they are based upon factors which are squarely within the ambit of considerations appropriate in the exercise of the zoning power. As thus limited, the concomitant agreement provides a source of flexibility by allowing an intermediate use permit, between absolute denial and complete approval of the petition. A zoning authority, empowered to permit a given use without restriction, should also be allowed to grant a use which is modified by contract conditions appropriately attached.

I think it is clear that a concomitant agreement cannot lend validity to a zoning change "solely for the benefit of private speculators." *State ex rel. Myhre v. Spokane, supra*, at 216. Any special zoning treatment must be based upon

some significant public benefit to be derived therefrom. But this simple statement of the rule is not directly responsive to those numerous situations in which there is a close and difficult balance between the factors for and against a proposed rezone. Certainly a proper concomitant agreement, to the extent that it allays the objections of those who are against the proposed use, is evidence that the opposition arguments were seriously considered and that the attendant zoning change was not arbitrary or capricious. As a more general consideration, the main benefit of concomitant agreements arises in situations where no response to the use proposal is correct beyond doubt. It is when competing uses within a zoning area each have valid claims that the compromise method available through a concomitant agreement is of greatest value. In such situations, where neither complete proscription nor unrestricted permission is desirable, a concomitant agreement which allows the rational result should not be vitiated simply because the factors favoring the proposed use, though substantial, might not be deemed sufficient per se to counterbalance those militating against unrestricted use.

In the present case we have, at least, closely balanced circumstances. The original comprehensive plan envisioned a change of zoning if and when Richfield decided to build a refinery on this site, and the original zoning classification reflected this purpose. That eventuality occurred. Meanwhile, according to the opponents, the area has changed in character under the original zoning classification to the extent that residential and recreational uses are of sufficient import to require special protection. Enforced uniformity of the current land uses in the area would be contrary to the spirit and letter of the original comprehensive plan. On the other hand, to permit unrestricted use of this site for a refinery would be to ignore the realities of existing and likely uses of the surrounding lands. In these circumstances, the combination of a rezone enactment with a valid concomitant agreement serves to protect the valid interests of the public and of the proponents and opponents of the use proposal.

I reiterate my opinion that the zoning actions here taken were neither arbitrary, capricious, nor subject to any other substantive attack. However, for present purposes, my point is that, even if the rezoning of this property to industrial use would be questionable standing alone, an effective concomitant agreement could remove such doubts.

Here, the concomitant agreement meets the requirements of validity set forth above. The performance called for is directly and exclusively related to the mitigation of public needs which will arise from the proposed use. The zoning authority is not bound by the agreement to exercise its zoning power in any way. There is some substantial public benefit to be derived, not only as a result of the proposed use but also from following a course that conforms to the blueprint set forth in the original comprehensive plan. Thus, the agreement meets our established tests for validity. Furthermore, performance by Atlantic Richfield of its obligations under this agreement will remove or minimize those effects of the proposed use which were the targets of the opponents' objections. This serves as added evidence that the zoning authority's actions were not arbitrary or capricious, and also serves to weight the balance of factors clearly in favor of this conditioned rezone.

(4) "Spot Zoning"

As a ground for decision separate from its "appearance approach," the majority also holds that the amendment to the comprehensive plan and the rezoning ordinance adopted pursuant thereto constituted "spot zoning." Again, I disagree.

The majority adopts a declaration found in a planning department report which was in evidence before the planning commission and board of county commissioners. There is no suggestion that the zoning authorities did not weigh the department report together with the other evidence in making their recommendations and decisions. That report, compiled by a nonlegal agency, expounds an erroneous definition of "spot zoning" which is limited to the private benefit element. The report then declares its equally erroneous

legal judgment that this zoning action would be "spot zoning."

The term "spot zoning" expresses the legal conclusion that a given zoning enactment (1) is inconsistent with the comprehensive plan for the area, and (2) operates to favor a particular individual or group, and (3) does not benefit the public welfare of the community. *Smith v. Skagit County, supra; Anderson v. Seattle*, 64 Wn.2d 198, 390 P.2d 994 (1964); *Pierce v. King County*, 62 Wn.2d 324, 382 P.2d 628 (1963). It should be obvious that a zoning enactment does not amount to spot zoning simply because it benefits a particular individual or group. If that were so, then virtually every comprehensive plan, zoning classification and conditional use permit would be a nullity, since all zoning enactments must be assumed to benefit those particular individuals or groups who favored them. To be meaningful, "spot zoning" analysis must effectively recognize all three elements.

Here, the zoning enactments in question were consistent with the language and intent of the original comprehensive plan. As noted earlier, that plan expressly anticipated amendment in the event that Atlantic Richfield decided to locate a refinery at this site. Thus, this record does not provide the first stated element of "spot zoning."

The majority acknowledges that the board of county commissioners weighed the various factors of public advantage in making its decision regarding these zoning actions. Among the factors indicating that change would be to the general community benefit were the facts that the proposed use would create a needed industrial base, provide significant public revenues, and fulfill the long-time expectations of the original comprehensive plan and the public service planning of local units of government. The majority does not pursue the matter further, but I think the conclusion is inescapable that these zoning enactments contributed significantly to the general welfare of the community. Thus, the facts are such that the third stated element of "spot zoning" is not present.

Under any meaningful definition of the term, "spot zon-

ing" is not present in this case. As applied by the majority, the term camouflages what is, in fact, a substitution by the court of its own judgment for that of the zoning authorities. This is beyond the bounds of proper judicial review. *Farrell v. Seattle,* 75 Wn.2d 540, 452 P.2d 965 (1969); *Bishop v. Houghton,* 69 Wn.2d 786, 420 P.2d 368 (1966); *McNaughton v. Boeing,* 68 Wn.2d 659, 414 P.2d 778 (1966).[8]

One suspects that, between the lines of today's majority opinion, there is an unspoken desire to advance a vaguely perceived policy in favor of "ecology." I am certainly not in favor of environmental pollution or wasteful destruction of our natural resources. But "ecology" is not a magic word. It expresses a set of yet-uncertain principles which, like other principles, must be sensibly applied. The term imports control, not proscription, of development.

As noted earlier, the controversy in this case is not a simple, clear-cut dispute between polluting profiteers and the guardians of the environment. It is a sincere dispute between community citizens, with each side possessed of legitimate arguments. I think the local zoning bodies fairly achieved the best available resolution of this matter, a resolution which this court has overthrown for reasons that seem to me invalid and inappropriate to judicial decision making.

For these reasons, I dissent from both result and rationale of the majority opinion. I would reverse.

HUNTER, J., concurs with NEILL, J.

---

[8]The full ramifications of the majority decision are yet to be seen. We recently noted that article 11, section 11, Washington State Constitution delegates a legislative power to localities that is equal to legislative power at the state level. *Petstel, Inc. v. County, of King,* 77 Wn.2d 144, 459 P.2d 937 (1969). Within the police powers granted by that section is the power to zone property. *State ex rel. Wenatchee Congregation of Jehovah's Witnesses v. Wenatchee,* 50 Wn.2d 378, 312 P.2d 195 (1957). Although the present case does not technically involve constitutional local legislative power, the majority's broad language has implications of intrusion into the legislative hearing and decisional process at local and state levels.